# United States Court of Appeals
## For the First Circuit

No. 02-2436

UNITED STATES OF AMERICA,
Appellee,

v.

S. JOEL EPSTEIN,
Defendant, Appellant.

No. 03-1133

UNITED STATES OF AMERICA,
Appellee,

v.

JOHN F. HANDEL,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before
Boudin, Chief Judge,
Torruella and Selya, Circuit Judges.

Syrie D. Fried, Assistant Federal Public Defender, for
appellant Handel.
John J. Barter, for appellant Epstein.
Kirby A. Heller, Attorney, Department of Justice, with whom
Michael J. Sullivan, United States Attorney, and Carmen M. Ortiz,
Assistant United States Attorney, were on brief, for appellee.

October 18, 2005

**TORRUELLA, Circuit Judge.** Defendants-appellants S. Joel Epstein and John Handel were convicted after a jury trial in the United States District Court for the District of Massachusetts for offenses related to a scheme to defraud the owners of timeshare units. They now appeal, challenging both their convictions and their sentences. We affirm.

## I. Background

The scheme that led to the appellants' convictions involved companies located in various parts of the country. Resort Investment Trust (RIT) and Swiss American Bank, called "buyers," were Florida-based telemarketing companies that solicited timeshare owners to sell their units and buy appraisals. Employees for these companies called timeshare owners with offers to buy their units, provided that the owners submitted certain documents related to their timeshares, including a recent appraisal. The owners were led to believe that their units would be purchased once they provided an appraisal, and that they would be reimbursed for the costs of the appraisal. The telemarketer then informed the owner that the appraisal must be performed by an independent company, and offered to refer the owner to Multiple Listing Service (MLS).[1] An employee from MLS then contacted the owner, provided the names and

---

[1] The acronym was designed to deceive the owners into believing that they were dealing with the familiar multiple listing service organizations that are used by real estate brokers across the country, when in fact there was no connection.

-2-

prices of four different appraisal companies, and asked the owner to choose one. The appraisal companies included Resort Condominiums International (RCI), based in Hyannis, Massachusetts, and International Appraisals (IA), based in Rhode Island. The MLS employee stressed that the appraisal companies were highly experienced and had personnel in the area of the timeshares who would perform on-site inspections of the properties. In fact, all of the recommended companies were part of the scheme, and there was no relation between the location of the companies and that of the timeshare. The telemarketers merely rotated the names of these companies and the prices they charged, typically $399. MLS employees repeated that the buying company would reimburse the owner for the cost of the appraisal.

Owners were then contacted by an employee of an Appraisal Referral Center (ARC), called a "closer", who introduced himself as an employee of the appraisal company that the victim had previously selected. The ARC telemarketer took the owner's credit card number and told the owner that an appraiser would be assigned to the property, that the buying company would be notified of the appraisal, which would trigger a letter of intent to buy the timeshare, and that the letter would not commit the owner, but would commit the buying company. The ARC telemarketer then faxed the owner's information to the appraisal company that the owner had previously selected, which charged $399 to the owner's credit card

-3-

and sent information about the unit to Comparative Research (an unaffiliated firm), which prepared a market analysis report for $7.50. Comparative Research sent the report back to the appraisal company, where a licensed real estate appraiser signed it. The appraisal company then sent the purported appraisal to the owner.

At this point, the fraud was complete. The companies neither reimbursed the appraisal fee nor bought the timeshares. Owners who complained had to call repeatedly, found that numbers had been disconnected, and were told to resubmit paperwork. In the event that an offer was actually made, it was for considerably less than what was promised.

The appraisal companies sent some of the collected funds to American Investment Monitoring Services (AIMS), which was a bill-paying operation that took in and disbursed funds to the other companies. At some point, AIMS stopped operating and Consolidating Consortium International (CCI) took over. The appraisal companies also sent $35 per appraisal to MLS, and transferred funds to an account in the Bahamas held by Donald Gonzcy, the mastermind of the scheme. During the course of the scheme, approximately 38,600 appraisals were sold at a cost of $399 each, for a total of over $15 million. Although Epstein started as a buyer for RIT in 1998, he quickly assumed a significant role in the overall operation. Working under the alias Joe Kelley, he ran another buying company based in Texas called Global Referral Service. Epstein was also

-4-

the president of ARC, the vice president of AIMS, and the president of CCI.  His duties in these various capacities included hiring and supervising telemarketers, providing them scripts for the calls, devising responses to common customer complaints, and tracking financial transactions and data related to the companies.

Handel began working for RCI, run by Gonzcy's future son-in-law Michael Upton, in 1998.  Handel came to the office every seven to ten days to sign the purported appraisals, usually signing between 100 and 150 appraisals at a time.  These reports, generated by Comparative Research, contained the number of bedrooms and bathrooms in a unit, the amenities on the property, the unit's condition, and a comparison to three other properties in the area.  They also provided an estimate of the market value of the unit, and a blank that purported to be the date of the inspection and of the report.  Handel spent a few seconds per report and inserted the date that he signed as the date of inspection.  RCI paid him five dollars for each appraisal that he signed.  At some point during his employment, Handel allegedly became concerned with the volume of appraisals RCI dealt with and asked Upton about the legitimacy of the operation and whether any timeshares were being bought.  Upton assured him that Gonzcy was buying many of the timeshares.  At some point Handel asked RCI to begin issuing his checks in his wife's name.

As part of his duties at RCI, Handel was responsible for responding to customer complaints. These complaints were placed in a file folder and contained phone messages and letters from owners, often dissatisfied with mistakes in the appraisal or because no on-site inspection had been done.[2]

Handel performed similar work for IA, which was based in Rhode Island and owned by Gonzcy's son Scott. Handel, who was not a licensed real estate agent in Rhode Island, met Scott in a Burger King parking lot and signed the IA appraisals with the name "James Rose".

On February 7, 2001, a grand jury issued a fifty-count indictment charging Epstein, Handel, Gonzcy, and several others with various counts. On July 18, 2001, a grand jury issued a superseding fifty-nine count indictment. On June 24, 2002, a jury trial commenced against Epstein, Handel, and Gonzcy in the United States District Court for the District of Massachusetts. On July 2, 2002, Gonzcy pleaded guilty to the charges against him, and trial proceeded against Epstein and Handel. On July 12, 2002, the district court dismissed nineteen of the counts in the superseding indictment pursuant to a motion by the government.

---

[2] In Handel's brief, he characterizes the complaints as "phone messages and irate letters from timeshare owners expressing displeasure about RCI's services: that the appraisal was only a market analysis, that the whole scheme was a scam, etc."

On July 18, 2002, the jury convicted Epstein of one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371; seven counts of mail fraud, in violation of 18 U.S.C. § 1341; five counts of wire fraud, in violation of 18 U.S.C. § 1343; and five counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The jury convicted Handel of five counts of mail fraud. The district court sentenced Epstein to 108 months of imprisonment, 36 months of supervised release, and a special assessment of $1,700. The district court sentenced Handel to 36 months of imprisonment, 36 months of supervised release, a fine of $98,500, and a special assessment of $500. Both defendants appealed, arguing that their convictions should be overturned or that they should be re-sentenced.

## II. Discussion

### A. Evidentiary Issues

Epstein and Handel argue that the district court erred in admitting certain evidence during trial. In order to preserve a claim of evidentiary error for appeal, "a timely objection . . . , stating the specific ground of objection," must appear in the record. Fed. R. Evid. 103(a)(1). We review the district court's decisions on the admissibility of evidence as to preserved claims for abuse of discretion. See United States v. Mercado Irizarry, 404 F.3d 497, 500 (1st Cir. 2005). If we find an error, "[i]t is settled that a non-constitutional evidentiary error is harmless

-7-

(and, therefore, does not require a new trial) so long as it is highly probable that the error did not influence the verdict." United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (internal quotations and modifications omitted).

For unpreserved errors, the standard of review is that of plain error. United States v. Barone, 114 F.3d 1284, 1294 (1st Cir. 1997). The plain error standard requires the appellate court to "find [1] that there is error [2] that is plain and [3] that affects substantial rights. When these three elements are satisfied, an appellate court may exercise its discretion to correct the error . . . only if the forfeited error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (citing United States v. Olano, 507 U.S. 725, 732, 736 (1993)) (internal quotations and citation omitted). For the third prong, the defendant has the burden of showing prejudice or that the error "affected the outcome of the district court proceedings." United States v. Colón-Muñoz, 192 F.3d 210, 222 (1st Cir. 1999).

### 1. Epstein

During trial, Peter Train, an employee for one of the buying companies involved in the conspiracy, testified about a cartoon he had given to a co-worker, Linda Alongi. The cartoon depicted a laughing hyena saying "I want to buy your timeshare," with the words "head buyer" appearing directly beneath the hyena.

Train testified that Alongi hung the cartoon on the wall above her desk, and that Epstein spoke with Alongi at her desk while the cartoon was on the wall. There was no testimony that Epstein actually saw or ever discussed the cartoon, and on cross examination, Train admitted that he had no personal knowledge that Epstein ever saw the cartoon.

The district court admitted the cartoon into evidence on the ground that if Epstein saw the cartoon, and the operation was "on the up and up," Epstein would have been shocked by the cartoon and would have taken corrective action. Epstein's counsel objected, arguing that the cartoon was unduly prejudicial under Fed. R. Evid. 403 and that there was no evidence that Epstein had ever seen the cartoon.

Epstein now claims that the district court abused its discretion in admitting the cartoon, arguing that there was insufficient foundation to conclude that Epstein manifested an adoption or belief in the truth of the cartoon. For our present purposes we will assume, without deciding, that the district court abused its discretion in admitting the cartoon into evidence. However, after carefully reviewing the record, we believe that any error that may have occurred was harmless, as it is highly probable that the error did not influence the verdict against Epstein. See Flemmi, 402 F.3d at 95.

Epstein argues that the cartoon was especially prejudicial against him because (1) it was pictorial in form, whereas most of the other documents admitted were printed materials, ledgers, or contracts, and (2) it was presented in the hope of establishing that the people involved in the conspiracy were callous and heartless. We disagree. First, the cartoon was one of over 200 documents admitted in the case against Epstein, and the testimony regarding the cartoon was extremely brief in relation to the rest of the trial. Second, other evidence regarding Epstein's knowledge of and involvement in the scheme was overwhelming. See United States v. Tejeda, 974 F.2d 210, 215 (1st Cir. 1992) (finding harmless error because of overwhelming evidence of guilt). Besides the documents, there was testimony from many witnesses regarding Epstein's involvement in the conspiracy. Together, the testimony and documents established that Epstein worked as an executive for at least four of the companies involved in the conspiracy, handled and tracked the financial data for the companies, produced scripts for the telemarketers, and was well aware of the numerous complaints against the companies. In light of the numerous documents and witness testimony against Epstein, we believe that it is virtually certain that the admission of the cartoon did not influence the verdict against him. We therefore conclude that any error was harmless.

## 2. **Handel**

During the government's case in chief, it introduced Handel's 1999 tax return into evidence. On the return, Handel indicated that he earned $30,490 in business income and that his business was appraisals. However, the return did not indicate approximately $15,000 that Handel received in the name of his wife. Handel did not immediately object to the tax return's admission into evidence, but subsequently filed a motion to strike, arguing that the tax return's admission violated Fed. R. Evid. 404(b) because it could constitute evidence of other crimes or bad acts, namely, that Handel filed a false tax return. In denying the motion to strike, the district court stated that the return was "part and parcel of [Handel's] conduct relative to this case," and also assured Handel that it would "not permit the government to argue propensity from the filing of the income tax return."

During the defense's case, Handel testified that he had acted in good faith when signing the appraisals. On cross-examination, the government questioned Handel about the misstatement on the return. The government also questioned Handel about a $3,900 business deduction he had claimed on the 1999 return for mileage expenses. Handel objected, arguing that the government's questioning violated Fed. R. Evid. 404(b). The district court stated that it was not admitting the evidence under Rule 404(b), but rather under Rule 608(b) as permissible

impeachment with previously admitted extrinsic evidence.  Handel did not object to the cross-examination under Rule 608(b), and continued to argue his objection under Rule 404(b), which the judge denied.  On the stand, Handel ultimately admitted that the business deduction on the tax form was a mistake.

Handel does not now argue that the admission of the tax form was improper.  Instead, Handel reiterates his argument that the use of the tax return for cross-examination was improper under Rule 404(b)[3] because it was evidence of a prior bad act.  We disagree.  "Rule 404(b), by its very terms, excludes only extrinsic evidence -- evidence of other crimes, wrongs, or acts -- whose probative value exclusively depends upon a forbidden inference of criminal propensity.  Evidence intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b)."  United States v. Manning, 79 F.3d 212, 218 (1st Cir. 1996) (internal citation and quotation marks omitted).  The judge found that the tax return was "part and parcel of [Handel's]

---

[3]  Fed. R. Evid 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

conduct relative to this case." Handel's tax return was intertwined with the crime because the tax return reports the income that he received from the fraudulent scheme. Further, the fact that Handel did not include all of his income suggests that he had knowledge of the fraudulent scheme. The judge did not abuse his discretion in finding the tax return to be part and parcel of the crime and properly allowed the evidence as intrinsic to the crime and not governed by Rule 404(b).

Handel now argues for the first time that the cross-examination violated Rule 608(b).[4] Because Handel did not specify

---

[4] At the time of trial, Fed. R. Evid 608(b) read:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters that relate only to character for truthfulness.

In 2003, Rule 608(b) was amended by substituting "character for truthfulness" in place of "credibility." The amendment intended to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness. See United States v. Abel, 469 U.S. 45 (1984).

-13-

at trial that he objected to the cross-examination under Rule 608(b), he has not preserved the claim, and this court will review only for plain error. To show plain error, Handel must show that he was prejudiced. Any prejudice that Handel would have suffered from a violation of Rule 608(b) is that the jury would think negatively of Handel's credibility. However, Handel cannot claim this prejudice in light of other evidence at trial more damaging to his credibility. Handel admitted that on three separate occasions he submitted documents to the Massachusetts Real Estate Board, "under pains and penalties of perjury," where he was required to state his previous criminal convictions and did not do so. Handel was convicted twice for "operating a motor vehicle to endanger" and once for "attaching the wrong plates to a motor vehicle." Handel claimed that he honestly believed that the convictions related to motor vehicles were excluded, but Handel also claimed that the mileage deduction on his tax return was a mistake. In addition, the three convictions were admitted into evidence at trial, and the judge gave a limiting instruction, stating that the prior convictions were relevant only for evaluating Handel's credibility. Thus, Handel has not borne the burden of showing plain error.

## B. Willful Blindness Instruction

Epstein and Handel both argue that the district court erred in giving the jury a willful blindness instruction in the

course of its instructions on mail fraud.[5]  "A willful blindness instruction is appropriate 'if [1] a defendant claims a lack of knowledge, [2] the facts suggest a conscious course of deliberate ignorance, and [3] the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge.'"  United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000) (quoting United States v. Richardson, 14 F.3d 666, 671 (1st Cir. 1994)).  "In determining whether the facts suggest the type of deliberate avoidance warranting an instruction, we must consider whether the record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness."  Id.

### 1.  Epstein

Epstein argues that the district court erred because he was led to believe that Gonzcy was an experienced and successful businessman and that the timeshares were being purchased in the Bahamas.  First, this argument supports the district court's instruction, as Epstein is claiming a lack of knowledge that the scheme was fraudulent.  Second, the facts of the case supported an inference that Epstein consciously chose deliberate ignorance of

---

[5]  The parties argue about whether review on this issue should be de novo or abuse of discretion.  Varying language appears in our own cases and in decisions of the circuits and may reflect the different aspects of the willful blindness problem in dispute in the individual cases.  In all events, whether in this case we reviewed the matter de novo or under a far more deferential standard, the result would be the same, so we leave the issue to a case where it turns out to matter.

the fraudulent scheme. Since he started in the organization at one buying company and ran another, he must have been well aware that the buying companies almost never purchased the time shares, nor did they refund the appraisal fees, despite contrary assurances from telemarketers at various stages of the scheme. As the individual responsible for tracking the companies' financial data, he must have been well aware that they were interdependent, despite claims to the contrary, and that their sole source of income was the sale of appraisals upon referrals originating exclusively from buying companies. In addition, as the individual responsible for producing the sales pitches and answers to common customer concerns, he must have been well aware both of the fraudulent promises and of the myriad customer complaints. Third, the instruction did not mandate an inference of knowledge but rather clearly spelled out that the government had to overcome several hurdles before the jury could find that the defendant was willfully blind, and that only then the jury could infer knowledge. We therefore find that the district court did not err in giving the willful blindness instruction regarding Epstein.

### 2. **Handel**

Handel argues that the district court erred in giving the willful blindness instruction because he had no knowledge of several of the misrepresentations in the pitch made to timeshare owners: that the owners would be reimbursed for the cost of the

appraisals, that the appraisal companies were independent, and that on-site inspections were being done by appraisers in the field. In addition, he argues that for another element of the pitch -- that the timeshares would be purchased by one of the companies -- he was not willfully blind because he asked his boss whether any units were being purchased.

As we have noted, a claim that a defendant lacked knowledge supports a willful blindness instruction, as it is the first of the three prerequisites to a willful blindness instruction. Therefore, Handel's claim that he lacked knowledge of the misrepresentations cuts in favor of the willful blindness instruction. The relevant inquiry then becomes whether "the facts suggest a conscious course of deliberate ignorance" on the part of the defendant. Coviello, 225 F.3d at 70 (internal citation and quotation marks omitted). The record evidence in this case reveals several "flags" of suspicion that, uninvestigated, suggest willful blindness.

The sheer volume of appraisals that Handel signed was a red flag. Handel admits in his brief that he found the volume "remarkable," and that "it raised concerns in his mind" to the point where he asked his boss Michael Upton whether any timeshares were being purchased. Handel argues that his inquiry and Upton's response show that the willful blindness instruction was inappropriate. However, while the jury was free to consider

Handel's actions in determining whether he was willfully blind, the fact that Handel asked Upton whether the properties were being sold supports a willful blindness instruction. On the one hand, the questioning strongly supports Handel's own argument that he had cause for concern. On the other hand, it would have been clear that the questioning was unlikely to result in a truthful response, since any admission by Upton would directly implicate him and his future father-in-law. Although experienced in the realty business, Handel took no further steps to determine whether Upton's "belief" that the properties were being purchased was a good-faith one.

Customer complaints, which Handel answered as part of his duties at RCI, also constituted a red flag. These complaints included phone messages and letters from owners, often dissatisfied because no on-site inspection had been done and charging that "the whole scheme was a scam." Despite these complaints, Handel never inquired into how the appraisals were produced or who produced them; he merely showed up and signed the appraisals, spending only a few seconds on each one.

Other red flags included (1) the fact that the appraisals he signed stated that they were based on on-site inspections even though Handel had not made any such inspections and never inquired whether they were made;[6] (2) the fact that he knew nothing about

_____

[6] Handel states in his brief that Upton never discussed with him about making on-site visits. He also states that many of the complaints that he handled were from customers upset because no on-

the company producing the reports, its methods or the training of it employees, and never asked Upton about it; (3) the fact that Upton and Gonzcy generated such a large number of appraisals so quickly even though Handel knew that both were inexperienced in the real estate business; (4) the fact that he was not questioned when he signed the appraisals for Gonzcy using a false name; and (5) the fact that he was not questioned when he asked RCI to issue paychecks in his wife's name. In sum, we think the record evidence reveals an ample number of flags to meet the second prerequisite for the willful blindness instruction. We therefore find that the instruction was proper with respect to Handel.

## C. Sentencing

Epstein and Handel both argue that they were improperly sentenced under the Federal Sentencing Guidelines. Their claims arise from the Supreme Court's partial invalidation of the Guidelines in United States v. Booker. 125 S. Ct. 738, 756 (2005). In Booker, the Court upheld a "defendant's [Sixth Amendment] right to have the jury find the existence of any particular fact that the law makes essential to his punishment." Id. at 749 (internal quotation marks omitted); see also Blakely v. Washington, 542 U.S. 296 (2004); Apprendi v. New Jersey, 530 U.S. 466 (2000). Applying this principle to the Federal Sentencing Guidelines, the Court held

---

site visit was made. Handel never asked Upton why on-site inspections were not being made, despite the fact that the appraisals he signed stated they were.

-19-

that because the Guidelines are "mandatory" and have the "force and effect of laws," any fact justifying a higher sentence must be found by the jury. Booker, 128 S. Ct. at 750. In contrast, "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." Id. To remedy the constitutional violation, the Booker Court invalidated "the provision of the federal sentencing statute that makes the Guidelines mandatory", "mak[ing] the Guidelines effectively advisory." Id. at 756-57. A Booker error thus occurs when the judge finds sentencing facts and imposes a sentence under the mandatory sentencing guidelines. Id.

Epstein and Handel correctly argue that their sentences violated the rule of Booker. In Epstein's case, the amount of loss for his conspiracy, mail fraud, wire fraud, and money laundering convictions was found by the judge. In addition, the judge also applied several sentencing enhancements, including "more than minimal planning" and "use of mass-marketing." Similarly, in Handel's case, the judge determined the amount of loss and an enhancement for "more than minimal planning." Because these sentencing facts were found by the judge under mandatory Guidelines, Epstein's and Handel's sentences violated the Booker rule.

"[A] Booker error . . . is preserved if the defendant below argued Apprendi or Blakely error or that the Guidelines were unconstitutional." United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005). The similarity of the constitutional issues present in Booker, Blakely, and Apprendi justifies the wide latitude afforded defendants for preserving Booker errors, but this latitude is limited. See United States v. Martins, 413 F.3d 139, 153 (1st Cir. 2005). For example, an "argument that the acceptance of responsibility guideline was unconstitutional" does not preserve a Booker error. Id. at 152. Further, while a Booker error may be preserved "when the trial court, on its own initiative, seizes the issue and makes an express ruling on the merits," id. at 153, it is not preserved when the trial court "muse[s], sua sponte, that there were no Apprendi issues involved in the hearing," id. at 152, and the trial court's "rumination form[s] no part of the court's rulings or holdings," id. at 153.

Epstein argues that his counsel sufficiently raised an Apprendi error. At sentencing, Epstein's counsel stated that he was "trouble[d]" by the "substantial difference" in loss found by the judge and the jury. Counsel then stated that the court must determine the amount of loss, to which the judge responded, "I have." The judge then asked counsel whether the sentence raised an Apprendi issue, to which counsel responded "no, he wouldn't be receiving beyond the statutory maximum." This exchange is clearly

insufficient to preserve a Booker error. The judge then, sua sponte, mused about the ramifications of Apprendi. The judge stated "[m]aybe I'm just wasting time because it would be dicta" and created a hypothetical where he "wonder[ed]" if an Apprendi issue would be present. Because the trial judge merely mused about an Apprendi issue and did not make any kind of holding or ruling on the issue, the Booker error is not preserved. See Martins, 413 F.3d at 152-53.

Handel does not claim to have preserved the Booker error below.

If a defendant fails to preserve a Booker error, the circuit court will review for plain error. Booker, 125 S. Ct. at 769; Antonakopoulos, 399 F.3d at 76. The test for plain error contains four prongs, which the defendant bears the burden of proving. United States v. Olano, 507 U.S. 725, 734 (1993). For a circuit court to correct an unpreserved error, it must find "an error that is plain and that affects substantial rights." Id. at 732 (internal quotation marks omitted). Then, only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings," may the circuit court, in its discretion, correct the error. Id. at 736 (internal quotation marks and alteration omitted). "The first two prongs of the Olano test as to Booker error are satisfied whenever defendant's Guidelines sentence was imposed under a mandatory Guidelines system." Antonakopoulos,

-22-

399 F.3d at 77.  For the third prong, we require a "defendant [to] show a reasonable probability that he would have received a more lenient sentence under an advisory guidelines regime."  Martins, 413 F.3d at 154.

Epstein and Handel argue that their Booker errors are plain errors that must be corrected by this court.  To show a reasonably probability that he would have received a more lenient sentence absent the error, Epstein cites three facts from the record.  First, his sentence was the minimum allowed by the Guidelines, and this certainly weighs in his favor.  Second, the judge reduced his sentence to reduce the disparity between Epstein and Gonczy, the mastermind of the crime, and he claims that the judge would have further reduced the sentence had he been able to. This also weighs in Epstein's favor.  Third, the sentencing judge stated that although there were "proper[] grounds to file a motion for a downward departure," they were not sufficient to warrant a downward departure.  From this statement, Epstein attempts to impute to the judge a desire to grant the downward departure that was obstructed by the "rigorous requirements" of the Guidelines. No such intent can be inferred from the trial transcript.  In contrast, the trial transcript shows that the judge had no inclination to give a lower sentence.  The judge flatly stated that it was "an appropriate sentence under the law."  Further, the judge stressed the gravity of the crime: "This is an enormous and

-23-

sophisticated fraud. . . . You were absolutely essential to getting this up and running.  You were central to it."  Although it is a close call, we find that Epstein has not shown a reasonable probability that he would have received a more lenient sentence and therefore has not shown plain error.

Handel's only argument in support of the third and fourth prong of <u>Olano</u>'s plain error test is that without the sentencing facts found by the judge, his sentence would have been thirty months shorter.  This is not relevant to showing what sentence the judge would had given had the Guidelines not been mandatory.  Moreover, the sentencing transcript shows that the judge would likely have given the same sentence under advisory guidelines.  Handel's sentence was not at the bottom of the Guidelines range.  Also, the judge emphasized Handel's culpability: "I think it makes you more culpable that you are a licensed real estate broker.  It was a sham from the get-go and you knew it was."  Handel thus has also not shown plain error.

Finally, Epstein also urges this court to find a structural error that would require reversal and a remand.  This court has already determined that "[b]ecause sentencing under a mandatory system is not an error that undermines the fairness of a criminal proceeding as a whole . . . a <u>Booker</u> type error is not a structural error."  <u>Antonakopoulos</u>, 399 F.3d at 80 n.11 (internal quotation marks omitted).

## III. <u>Conclusion</u>

For the reasons stated above, we affirm the convictions and sentences of Epstein and Handel.

**<u>Affirmed</u>**.