# United States Court of Appeals
## For the First Circuit

No. 04-1714

UNITED STATES OF AMERICA,

Appellee,

v.

MERALDO LIZARDO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. Senior District Judge]

Before

Torruella and Lynch, Circuit Judges,
and Lasker,[*] Senior District Judge.

James B. Krasnoo, with whom the Law Offices of James B. Krasnoo was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellee.

April 26, 2006

---

[*] Of the Southern District of New York, sitting by designation.

**TORRUELLA, <u>Circuit Judge</u>.** A jury convicted defendant Meraldo Lizardo for conspiring to distribute cocaine in violation of 21 U.S.C. § 846 and for unlawful use of a communication facility in violation of 21 U.S.C. § 843(b). The district court sentenced Lizardo to a term of imprisonment of 60 months. On appeal, Lizardo contests both the conviction and the sentence. We affirm.

## I. Background

From 1997 to 2000, Lizardo was a deputy sheriff in the Essex County Sheriff's department in Massachusetts. He was a member of the Warrant Apprehension Unit and worked with state and local law enforcement. The jury convicted Lizardo of conspiring to distribute cocaine with two other individuals, Carlos Bello and Tilson Yturrino. Before presenting the factual background of this case, we give a brief summary of the roles played by Bello and Yturrino.

Bello owned a business in Lawrence, Massachusetts, called Bello's Multi Services, from which he would sell cocaine to dealers, who in turn sold the cocaine on the street. Bello and Lizardo knew each other, and they would meet at Bello's Multi Services. Bello pled guilty to conspiracy to distribute cocaine and was sentenced to 120 months' imprisonment.

Yturrino purchased cocaine from Bello at Bello's Multi Services over a period of about seven years. Yturrino and Lizardo met each other on several occasions at Bello's Multi Services.

Yturrino ran a cocaine distribution business, and he had several employees selling cocaine on the streets. Yturrino pled guilty to conspiracy to distribute cocaine and was sentenced to 97 months' imprisonment. In exchange for his testimony against Lizardo, Yturrino's sentence was reduced to 60 months.

**A. Investigation**

Law enforcement officers were investigating Bello for drug crimes and obtained a wiretap authorization to monitor his cell phone. In a December 16, 1999 conversation between Bello and a person named "Enano," Enano chastised Bello for posting bail for a person who had been arrested for counterfeiting money because that could involve federal law enforcement authorities. Enano then became a suspect in the investigation. Lizardo later admitted that he was the person named Enano in this conversation.

On December 17, Sergeant Donald Kennefick interviewed an inmate at the Essex County Jail regarding drug trafficking in Lawrence, and Lizardo assisted in the interview by providing Spanish translation. It is not clear if this interview was related to drug trafficking by Bello or Yturrino. After the interview, Lizardo initiated a conversation with Kennefick, which the government contends was an attempt to divert investigation of drug trafficking away from Bello. Lizardo mentioned a recent fire in Lawrence that had burned down several businesses, including Bello's Multi Services. He stated that the fire was caused by a dispute

-3-

over heroin trafficking in a sandwich shop. When Kennefick responded that he thought that the dispute involved cocaine trafficking and not heroin trafficking, Lizardo stated that the shoe store across the street was run by cocaine dealers. When Kennefick asked Lizardo for more information about this drug trafficking, Lizardo responded that he had already given this information to Mark Rivet of the Lawrence Police Department. In fact, Lizardo never had this conversation with Rivet. Lizardo did not mention Bello or Bello's business to Kennefick during this conversation.

At 11:15 a.m. the same day, Lizardo called Bello and had the following conversation:

Lizardo: What have you done?

Bello: What happened?

Lizardo: Nothing man.

. . . .

Bello: What happened, any problem?

Lizardo: No, no, I said to take care.

Bello: What happened?

Lizardo: I can't tell you over the phone but take care okay.

Bello: But . . . but . . . damn . . . what's going on old man?

Lizardo: I can't tell you over the phone man.

At 12:44 p.m., Lizardo and Bello had another conversation:

-4-

        Lizardo: Did you already eat?

        Bello: That if I ate?  No.

        Lizardo:  It's  better  to  wait  for  me  there.
        You know right there at . . . where we usually
        go to eat sometimes.

        Bello:  Uh-uh.   Hold on,  hold on.   Where we
        usually go.  More or less what is the name of
        the place?

        Lizardo: Uh?

        Bello: What's the first sign of this place?

        Lizardo: It starts with a number.

Bello and another man then drove to the Ninety-Nine Restaurant,
while under surveillance by undercover officers.  The officers
entered the restaurant and observed Bello sitting with Lizardo.
After leaving the restaurant, Bello and Lizardo had another phone
conversation where they discussed the officers whom they knew were
surveilling them at the restaurant.

        Officers  intercepted  two  phone  calls  on  December  21.
Around 3:11 p.m., Bello had a conversation with a person named
Daniel:

        Bello: Is it for whenever or does it have to
        be right now?

        Daniel: . . . I want to go tonight and buy me
        some shoes.

        Bello: Oh, alright.

        Daniel: Do you understand me?  You see, it's
        because I'll be going to the party tonight.

        . . . .

-5-

Bello: . . . but so we're partying tonight, right?

Daniel: Yes!

Around 6:49 p.m. the same day, Bello and Lizardo had the following conversation:

Bello: Until what time is your detail?

Lizardo: Until 11:00 p.m.

Bello: So that you could do it today?

. . . .

Lizardo: What . . . we have to make a trip to Boston?

Bello: No . . . right there . . . in any one of those places.

That night around 11:30 p.m., an officer surveilling Bello's residence saw Lizardo arrive and enter Bello's residence. He then saw Bello drive a minivan out of the garage with Lizardo as a passenger. Six unmarked police vehicles followed the minivan.

The officers followed Bello to Lynn, Massachusetts, and observed him driving at a high rate of speed. Bello parked outside a nightclub named Casa del Sol. Several of the surveillance vehicles drove past Bello, and one officer observed Lizardo pointing out the undercover vehicles to Bello. The officers saw Bello and Lizardo enter the nightclub.

Around 1:00 a.m., Bello and Lizardo left the nightclub and got back in the minivan. Bello drove on the highway at a slow rate of speed, about 45-50 miles per hour. At one point, Bello

exited the highway, but at the bottom of the ramp he made a U-turn to get back on the highway. An officer who was driving behind them saw Bello and Lizardo looking directly at him as they passed each other. The officers continued to follow the minivan and saw Bello exit onto a rotary. The officers pulled over before the rotary and saw Bello drive around the rotary five times before continuing. At this point, the officers broke off their surveillance.

The next morning, December 22, Lizardo called Sergeant Kennefick and told him that he went to a nightclub the previous night with his cousin (Bello was not his cousin), an informant who could provide information about heroin dealers in Lawrence. Kennefick asked to meet his cousin, and Lizardo said he could arrange a meeting but never did.

On April 13, 2000, officers interviewed Lizardo regarding his involvement with Bello's cocaine trafficking operation. Lizardo said that he had known Bello for about two years and was aware that he had been a cocaine dealer, but he thought that Bello had since stopped dealing cocaine. The officers showed Lizardo the transcripts of the telephone calls between Lizardo and Bello, and Lizardo admitted that he was the person on the phone with Bello. Lizardo also admitted to conducting countersurveillance on December 17 and 21 and stated, "It was wrong for me to burn surveillance." The officers asked him if he had ever taken advantage of his position as deputy sheriff to run warrant checks or Registry of

Motor Vehicle checks for Bello,[1] and after remaining silent for about three minutes, Lizardo responded that he had not. Lizardo initially admitted to having warned Bello that he was under police investigation but later denied that he had done so. At the conclusion of the interview, the officers arrested Lizardo.

## B. Yturrino's Testimony

Yturrino testified at trial as to his relationship with Bello and his knowledge of the relationship between Bello and Lizardo. From 1993 to 1999, Yturrino bought cocaine from Bello at Bello's Multi Services. He purchased approximately a kilogram of cocaine every two weeks.

On one occasion in 1998, Yturrino went to Bello's Multi Services and was startled to see Lizardo wearing his uniform in Bello's office. After Lizardo had left, Bello assured Yturrino that Lizardo was under his control. On about eight or nine occasions, Lizardo was present when Yturrino delivered thousands of dollars in cash to Bello. He would openly place the cash on Bello's desk and not make any effort to conceal his actions. On about fifteen occasions, Lizardo was present when Yturrino picked up kilogram-sized packages from Bello. He described one occasion in particular, where in Lizardo's presence, Bello took a 1.5

_____

[1] Yturrino testified, as described below, that Lizardo ran these checks for him.

-8-

kilogram block of cocaine out of a bag, put it in a Nextel[2] box, and gave it to Yturrino, who put it in his briefcase and departed.

Yturrino also met with Bello in Lizardo's presence at nightclubs and restaurants, including the Ninety-Nine Restaurant. During these meetings, Yturrino and Bello spoke openly about their cocaine business. Yturrino also talked to his employees on his cell phone and brought his business ledger with him.

To avoid the attention of law enforcement, Yturrino only wanted employees without outstanding arrest warrants. On several occasions, Yturrino gave Bello a piece of paper with the name, social security number, and date of birth of an employee for the purpose of having Lizardo run a warrant check. In one instance where Yturrino, Bello, and Lizardo were all at the Ninety-Nine Restaurant, Yturrino called a new employee to obtain his social security number and date of birth. He wrote this information on a piece of paper and handed it directly to Lizardo. Lizardo took the paper and said that he would take care of it. Several days later, Yturrino and Bello were at Bello's Multi Services when Lizardo entered and gave Bello a piece of paper with the results of the warrant check, and Bello gave the paper to Yturrino.

At times, Yturrino suspected that certain vehicles might be part of undercover surveillance efforts. By having the plate

---

2    Nextel is a manufacturer of cell phones with walkie-talkie capability.

checked with the Registry of Motor Vehicles, Yturrino could learn whether such vehicles were law enforcement. On one occasion, Yturrino handed Bello a piece of paper with a license plate number, who in turn handed it to Lizardo. Yturrino later learned that the vehicle was not tied to law enforcement.

### C. Lizardo's Testimony

Lizardo testified in his own defense at trial. Lizardo said that he knew Bello and sometimes met with him at Bello's Multi Services. On two occasions, Yturrino was also present, but he did not see them exchange drugs or cash. Lizardo denied running any warrant or registry checks for Bello or Yturrino and denied that the two of them ever discussed their cocaine business in his presence. Lizardo also interpreted the telephone conversations between himself and Bello, attributing non-inculpatory meaning to the unclear statements.

Regarding the two occasions when officers surveilled Lizardo and Bello, Lizardo denied having assisted with any countersurveillance actions. Further, he was upset with Bello's attempts to evade surveillance. Lizardo testified that he was suspicious of the officers surveilling them at the Ninety-Nine restaurant because he thought the officers might be gay or connected to criminals he had recently arrested. He stated that he went to the Casa del Sol nightclub with Bello because he wanted to

use Bello as an informant and arrange a meeting between Sergeant Kennefick and Bello.

## II. Sufficiency of the Evidence

Following the jury's verdict, Lizardo filed a motion for a judgment notwithstanding the verdict, arguing that no reasonable jury could have convicted him based on the evidence presented at trial. The district court denied the motion, and Lizardo appeals. Our review is de novo. United States v. Ruiz, 105 F.3d 1492, 1495 (1st Cir. 1997). When considering the evidence presented at trial, we resolve all questions of credibility and reasonable inferences in favor of the verdict. Id. If, in this light, any reasonable jury could find all the elements of the crime beyond a reasonable doubt, we must uphold the conviction. United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004).

To convict Lizardo for conspiracy to distribute cocaine under 21 U.S.C. § 846, the government must prove "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990). "The third element, voluntary participation, requires a showing of intent to agree to the conspiracy and intent to effectuate the object of the conspiracy." Casas, 356 F.3d at 126 (citing Ruiz, 105 F.3d at 1499). The agreement need not be express and may be

shown by circumstantial evidence.  United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989).

The evidence presented at trial was clearly sufficient for a jury to find the first two elements of the conspiracy conviction.  For many years, Yturrino purchased cocaine from Bello.  On numerous occasions, Lizardo was present when cocaine and money exchanged hands between Yturrino and Bello.  In one instance, Lizardo was in uniform, which made Yturrino nervous, but Bello assured Yturrino that Lizardo was under his control.  During their meetings, Yturrino and Bello openly discussed their business, Bello reviewed ledgers of the business, and Yturrino called his employees.  A reasonable jury could find that a conspiracy to distribute cocaine existed and that Lizardo had knowledge of the conspiracy.

The evidence was also sufficient to show that Lizardo voluntarily participated in the conspiracy.  Lizardo ran license plate checks for Yturrino when Yturrino feared that a particular vehicle might be associated with law enforcement activities.  Lizardo also ran warrant checks for Yturrino because Yturrino wanted to be sure that his employees did not have outstanding arrest warrants.  In a number of ways, Lizardo attempted to help Bello evade police investigation.  Lizardo pointed out police surveillance, alerted Bello to a possible wiretap of his phone, and even attempted to divert police investigation away from Bello.  All

of these actions clearly aided the conspiracy or would have aided the conspiracy had Lizardo been successful.  A reasonable jury could infer from this evidence that Lizardo intentionally agreed to join the conspiracy and that he intentionally effectuated the sale of cocaine.

Lizardo presents several factors to support his claim that a reasonable jury could not find that he had the requisite intent.[3] First, he notes that he did not have knowledge of the details of Bello's distribution scheme.  But "[i]t is not necessary that . . . [he] knew all the details of the conspiracy" as long as he knew the "essential nature of the plan and [his] connections with it." Rivera-Santiago, 872 F.2d at 1079.  Second, Lizardo puts forth a long laundry list of actions that he did not take to further the conspiracy.  He never possessed cocaine, sold cocaine, planned the delivery of cocaine, or put buyers in touch with sellers.  All of this, however, is insufficient as direct participation in drug sales is not necessary.  Id.; see also United States v. Frink, 912 F.2d 1413 (11th Cir. 1990) (voluntary participation by fraudulently changing license plates); United States v. Ashley, 555 F.2d 462 (5th Cir. 1977) (voluntary participation by serving as contact person).  Third, Lizardo cites

_____

[3]  Lizardo cites a number of our cases in his attempt to show that the evidence against him was insufficient.  Because all of these cases are easily distinguishable from the present case, we decline to address them individually.

-13-

United States v. García-Torres, 280 F.3d 1, 4 (1st Cir. 2002) and argues that he merely provided a "peripheral service" to the conspiracy that was insufficient to find voluntary participation. In García-Torres, however, the crux of the issue was not whether the defendant's act was peripheral, but whether the defendant had knowledge of the conspiracy and voluntarily participated in it. Id. Given that we have already determined that a reasonable jury could find all the elements of Lizardo's conspiracy conviction, we need not separately determine whether his acts were peripheral. Finally, Lizardo argues that because Yturrino's testimony was uncorroborated, the government's case rests on a "slender reed." While Yturrino's testimony was essential to Lizardo's conviction, the government presented additional evidence to support Yturrino's testimony. Officers testified that they observed Lizardo helping Bello evade surveillance, that Lizardo admitted to helping Bello evade surveillance, and that Lizardo attempted to divert investigation of drug trafficking away from Bello. The intercepted phone calls, while not explicitly incriminating, also suggest that Lizardo was involved in illegal activity. We find that there was ample evidence to support his conviction.

Lizardo also argues that we must reverse his conviction for unlawful use of a communication facility, because it depends on the conspiracy conviction and the evidence for that conviction was insufficient. Because we uphold Lizardo's conspiracy conviction,

we also uphold his conviction for unlawful use of a communication facility.

## III.  Interpretation of Evidence

Lizardo claims that the district court erred in allowing Yturrino and several officers to interpret recorded telephone conversations.  He argues that interpretation was unnecessary because the language was clear, and he also argues that the interpretations unduly influenced the jury.

### A.  Yturrino

Yturrino was presented as a lay witness,[4] and the admissibility of lay opinion testimony is determined by Federal Rule of Evidence 701, which provides

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

A "lay witness[] with . . . inside knowledge [may] give [his] opinion[] as to the meanings of 'code words' used by fellow conspirators in taped conversations," so long as that testimony comports with the requirements of Rule 701.  United States v.

---

[4]  In arguing that Yturrino's interpretations of the conversations were erroneously admitted, Lizardo mostly cited cases concerning the admission of expert testimony, which are not relevant to determining the admission of lay opinion evidence.

Gaines, 170 F.3d 72, 77 (1st Cir. 1999). A witness may also testify about his subjective interpretation of a conversation in which he is participating as long as "his opinion is rationally based on his perception and is helpful either to an understanding of his testimony or to the determination of a fact in issue." United States v. Saccoccia, 58 F.3d 754, 780 (1st Cir. 1995). We review the admission of lay opinion testimony for manifest abuse of discretion. United States v. Kornegay, 410 F.3d 89, 94 (1st Cir. 2005).

At trial, Yturrino interpreted the following statements from recorded telephone conversations:[5]

> (1) "You are using your feet, man, not your head, man. What's going on with you, man?"
>
> (2) "You know he could go in for that. You know that's a federal."
>
> (3) "This is 10 talking, listen."
>
> (4) "Have you talked to the tiger."
>
> (5) "I can't tell you over the phone, but take care, okay."
>
> (6) "What's the first sign of this place?"
>
> (7) "The . . . the . . . the one with the stripes."

---

[5] Lizardo objected to all of Yturrino's interpretations except for that of the first. The admissibility of interpretation of the first statement is therefore subject to plain error review. Bandera v. City of Quincy, 344 F.3d 47, 55 (1st Cir. 2003). We review the admissibility of interpretations of the remaining statements for manifest abuse of discretion. Kornegay, 410 F.3d at 94.

(8) "I even paged him and stuff and put 911 and he hasn't got back to me."

(9) "No.  Right there in any of those places."

Lizardo argues that the meanings of the statements in the recorded conversations are clear, and it was thus error to allow Yturrino to interpret them.  With respect to statements (3), (4), (7) and (8), we disagree, as those statements clearly contain terms that could be construed as code words.

Yturrino's interpretations were also useful in understanding statements (1), (2), (5), (6), and (9).  In statement (2), Lizardo chastised Bello for posting bail for a person who could be charged with a federal crime.  Yturrino explained:

> In other words, if federal authorities were to get involved in that, . . . their ways of investigation usually range far beyond just what's going on at that point.

The average juror probably does not understand the difference between federal and state criminal prosecutions, and Yturrino's experience as a drug dealer allowed him to explain the meaning of Lizardo's statement.  In statements (1), (5), (6), and (9), Bello and Lizardo did not employ code words, but the statements were either deliberately ambiguous or of uncertain meaning.  Yturrino, as a co-conspirator, was present at or a participant in many conversations between Bello and Lizardo.  He was thus in a position to understand even the unclear conversations in which he was not a part.  Because of his "first-hand familiarity with the surrounding

-17-

events and conduct," we find no manifest abuse of discretion in allowing his interpretations of these statements. See Gaines, 170 F.3d at 77.

Even if we were to find that the district court manifestly abused its discretion, Lizardo never states specifically how Yturrino's interpretations prejudiced him at trial. He states that the interpretations "usurped the jury's function and gave the telephone calls importance that they otherwise lacked," "improperly drew inculpatory inferences," and put "stamps of approval on the government's theory." In claiming prejudice, Lizardo only referred to Yturrino's interpretation of statement (2), which we quoted above. We do not find this interpretation to be significantly prejudicial.

## B. Officers Cepero, Joyce, and Prior

Lizardo asserts that interpretations of the conversations made by officers Jaime Cepero, Bryan Joyce, and Richard Prior were also prejudicial. These contentions are easily disposed of. First, in a conversation between Bello and Lizardo, Lizardo requested a meeting at "the restaurant that begins with the numbers." Sergeant Prior surmised that he meant the "Ninety-Nine Restaurant." Lizardo did not object to this testimony, and this testimony was not in error, never mind plain error.

Lizardo also contests Trooper Cepero's testimony that he concluded from statement (2) that Lizardo was involved in criminal

activity. This was not an improper interpretation for two reasons. First, it was Cepero's subjective conclusion after hearing the conversation and not an interpretation of the meaning of the conversation. See United States v. Morton, 391 F.3d 274, 277 (D.C. Cir. 2004). Second, this statement was elicited on cross-examination by Lizardo's counsel, who cannot now contest his own invited error. See McDonald v. Fed. Labs., Inc., 724 F.2d 243, 248 (1st Cir. 1984).

Finally, Lizardo argues that Trooper Joyce improperly interpreted the phrase "one of those places" as a plan "by Lizardo and Bello to arrange for a pickup of drugs by Bello." However, on the pages of the transcript cited by Lizardo, Joyce does not provide any interpretation of the phrase "one of those places."

### C. Deputy Sheriff Aguilar

At trial, Lizardo sought to present Deputy Sheriff Aguilar as a witness to present non-inculpatory interpretations of the conversations between Lizardo and Bello. The district court committed no error in excluding this testimony. Lizardo did not present Aguilar as an expert witness, and he failed to establish any foundation for Aguilar's testimony as a lay witness by showing that Aguilar's opinions or inferences would have been "rationally based on [his] perception[s]" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701.

## IV.  Willful Blindness

Lizardo argues that he was prejudiced by the court's willful blindness instruction because it mandated an inference of knowledge and because it allowed an inference of voluntary participation from deliberate ignorance.  The parties dispute whether Lizardo timely objected to the instruction.  Because it makes no difference to our conclusion, we will presume that Lizardo did validly object to the instruction.

"A willful blindness instruction is appropriate if [1] a defendant claims a lack of knowledge, [2] the facts suggest a conscious course of deliberate ignorance, and [3] the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge."  United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005) (internal quotation marks omitted).  The parties dispute the standard of review for the propriety of a willful blindness instruction and our precedent is unclear.[6]  See id. at 440 n.5. Our outcome is the same whether we apply a de novo or deferential standard of review, so we do not decide this issue today.

The first element is clearly satisfied since Lizardo denied having knowledge of the conspiracy.  The second element is

---

[6]  The government cites United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000), and argues that we should review for abuse of discretion.  Lizardo cites United States v. Keene, 341 F.3d 78, 83 (1st Cir. 2003), and argues that our review is de novo.  The standard of review could depend on the prong of the test under review.  In Coviello, we addressed the second prong while in Keene, we addressed the third prong.

-20-

also satisfied, but some explanation is needed.  The evidence at trial suggested that Lizardo had direct knowledge of the conspiracy to distribute cocaine and does not immediately suggest that he took a "conscious course of deliberate ignorance."  Id.  "But a jury may find a witness credible in part and incredible in part."  See United States v. Lizotte, 856 F.2d 341, 343 (1st Cir. 1988).  If the jury did not believe Yturrino's testimony that Bello handed him drugs in Lizardo's presence, then the remaining evidence would suggest that Lizardo remained willfully ignorant of Bello's illegal activities.  The exchange of large amounts of cash and the request for warrant and registry checks are flags of suspicion that suggest willful blindness.  See Epstein, 426 F.3d at 440.

Regarding the third element, Lizardo states in conclusory fashion that the willful blindness instruction mandated an inference of knowledge. We find no such inference.  In instructing the jury on willful blindness, the judge took precautions to avoid such a mandate:[7]

---

[7]  This cautionary statement was preceded by the following instruction:

In deciding whether the defendant acted knowingly, you may infer that the defendant had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him.  In order to infer knowledge, you must find that two things have been established: First, that the defendant was aware of a high probability of the fact in question; second, that the defendant consciously and deliberately avoided learning of that fact.  That is to say, the defendant willfully made himself blind to that fact.

-21-

It is entirely up to you to determine whether he deliberately closed his eyes to the fact and, if so, what inference, if any, should be drawn. It is important to bear in mind, however, that mere negligence or mistake in failing to learn the fact is not sufficient. To find willful blindness of a fact, you must find a deliberate effort to remain ignorant to that fact.

In addition, the court twice reminded the jury that "[a]n act is done knowingly by a defendant if the defendant realizes what he or she is doing and does not act through ignorance, mistake or accident." Taken as a whole, the willful blindness instruction did not mandate an inference of knowledge.

While the jury was properly allowed to consider whether Lizardo remained willfully blind to the second element of the conspiracy charge -- knowledge of the conspiracy -- Lizardo also argues that the jury instructions improperly allowed the jury to apply willful blindness to the third element -- intent to agree to the conspiracy and intent to effectuate the object of the conspiracy. There is something to this argument. Unfortunately, the instructions were not clear that willful blindness applied only to the second element of the conspiracy charge. The third element requires an intent to join the conspiracy, and that is not established by willful blindness. The intent to join may, nonetheless, be established by inference from other evidence. The instruction given was ambiguous and was not necessarily understood as equating intent and willful blindness.

-22-

Lizardo's concern is a valid one, but he has shown no prejudice. The evidence of intent to join the conspiracy was very strong. Lizardo carried out acts to effectuate the purpose of the conspiracy. While there should have been greater clarity in the instruction, there is no reason to think it had any effect.

The district court was not as clear as it could have been in charging the jury with the elements of the conspiracy charge. Rather than separate the knowledge element from the intentional element, the district court required the government to show that Lizardo acted "knowingly and willfully" or "knowingly, willfully, and intentionally" for all elements of the crime. Since this raised the government's burden of proof as to the knowledge element of the conspiracy, Lizardo cannot claim prejudice from this additional requirement. Lizardo also cannot argue that the jury confused the concepts of knowingly and willfully as the district court explicitly instructed the jury on willfulness:

> The word willfully means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with a bad purpose either to disobey or disregard the law.

The district court later reminded the jury:

> Intentionally does not include acts done by ignorance, mistake, or accident. To act or participate willfully means to participate knowingly, willfully, and voluntarily and with the specific intent to do something that is unlawful.

-23-

The court also cautioned the jury not to convict unless Lizardo voluntarily participated in the conspiracy:

> If you find from the evidence that the defendant in this case did not agree to participate in the conspiracy charged in the indictment, you are instructed that he is not a conspirator even if his actions appear to have furthered the object of the conspiracy.

We find no error in the court's willful blindness instruction.

## V.  Prosecutorial Misconduct

Lizardo contends that improper statements by the government during its opening and closing arguments justify a new trial.

### A.  Opening Argument

Lizardo objects to three statements by the prosecution during its opening argument:

> (1) Bello and Yturrino "counted thousands of dollars in drug proceeds . . . while the defendant sat in his uniform and watched."
>
> (2) "Bello would brag about the quality of the cocaine, how he didn't need chemicals to cut it up, how pure it was."
>
> (3) "Yturrino would be on a telephone talking to his drug couriers and the defendant would chime in, 'you guys are changing cars, right?' to avoid police detection."

The government concedes that it did not produce evidence at trial to support these three statements.  Because Lizardo did not object to these statements at the close of the government's case, we

-24-

review for plain error.  See United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005).

Although unsupported by the evidence presented at trial, we do not find these three statements to be significantly prejudicial.  Regarding the first statement, Yturrino testified that he openly gave Bello thousands of dollars in cash in Lizardo's presence.  The fact that they did not actually count the money in Lizardo's presence is of minor importance.  Regarding the second statement, Yturrino testified that Bello gave him a 1.5-kilogram package of cocaine in Lizardo's presence.  Any statement by Bello as to the quality of the cocaine is largely irrelevant.  The third statement is the most troublesome, as it directly ascribes culpable conduct to Lizardo.  The statement indicates that Lizardo helped members of the conspiracy evade police investigation in one particular instance.  Given that Lizardo admitted to helping Bello evade police surveillance and that officers testified that Lizardo helped Bello evade surveillance, we do not find this false statement significantly prejudicial.  Other aspects of the trial also reduced the possibility of prejudice. When questioned by the government concerning the first two statements, Yturrino's testimony clearly indicated that they were false.  Further, Lizardo's counsel emphasized to the jury in his closing statement that the government had made these three false statements.  Since

we find no prejudice, there was no plain error.  United States v. Padilla, 415 F.3d 211, 226 (1st Cir. 2005).

### B. Closing Argument

Lizardo also claims that the prosecution made three improper statements during its closing argument.  Lizardo objected to these three statements "so we review de novo the question of whether the comment was improper and review for abuse of discretion the question whether the misconduct, if any, warrants a new trial."  United States v. Hernández, 218 F.3d 58, 68 (1st Cir. 2000).

The first alleged error is the prosecutor's reiteration that Bello and Yturrino counted money in Lizardo's presence.  The district court clearly erred in allowing this statement since the evidence did not support it.  However, as described above, we do not find this error prejudicial.

The second alleged error is the prosecutor's suggestion that Lizardo informed Bello that his phone might be tapped.  The following conversation was presented into evidence:

> Bello: What happened?
>
> Lizardo: I can't tell you over the phone but take care okay.
>
> Bello: But . . . but . . . damn . . . what's going on old man?
>
> Lizardo: I can't tell you over the phone man.

Later that day, in another conversation presented at trial, Bello told a third person that his phone might be tapped.  "Prosecutors

are free to ask the jury to make reasonable inferences from the evidence submitted at trial," and we think this was a reasonable inference.  Id.

Finally, the prosecutor stated multiple times, largely for rhetorical effect, that Lizardo "used his badge as a shield." Lizardo contends that the "prosecutor improperly argued that Lizardo tried to use his 'badge' as a shield from responsibility," because it "suggested that Lizardo should not take the stand to defend himself."  We do not think the prosecutor's statements bear the inference that Lizardo would impose.

Finally, taken cumulatively, the errors in the opening and closing arguments do not justify a new trial.  The only error in the closing argument was identical to one of the errors in the opening argument and was only infinitesimally prejudicial if at all.  Lizardo contends that the evidence supporting his conviction was so thin that these errors could have changed the outcome.  We disagree.  The evidence against Lizardo was substantial, and any possible prejudice was relatively insignificant.

### VI.  Wiretaps

During its investigation of this case, the government received several wiretap authorizations.  The initial wiretaps named Bello as a target.  The first wiretap authorization to name Lizardo as a target was issued on December 27, 1999.  Lizardo moved to suppress evidence only from the December 27 authorization.  The

district court denied this motion to suppress, but the government did not use any evidence obtained from this wiretap at trial. The government did submit as evidence at trial recorded conversations from authorized wiretaps before December 27, and Lizardo did not make any pre-trial objections to these other wiretap authorizations. On appeal, Lizardo now contests these wiretaps for the first time, arguing that evidence obtained from the wiretaps should be suppressed.

The Federal Rules of Criminal Procedure clearly state that a motion to suppress evidence must be made before trial and that the failure to do so constitutes waiver. Fed. R. Crim. P. 12(b), (e). Although the Rules allow the district court to grant an exception for "good cause," Fed. R. Crim. P. 12(e), Lizardo did not seek to suppress the wiretaps at trial. Lizardo does not address the waiver issue. We see no reason why we should consider the suppression of these wiretaps for the first time on appeal. See United States v. Luciano, 329 F.3d 1, 9 (1st Cir. 2003).

## VII. Sentencing Errors

The jury convicted Lizardo of conspiracy to distribute cocaine but did not determine the drug quantity that should be attributed to him. The sentencing judge found by a preponderance of the evidence that 1.5 kilograms of cocaine was attributable to

Lizardo.[8]  From this, the judge computed a Guideline sentencing range of 46-57 months.  However, the judge imposed a greater sentence, 60 months, because that was the statutory mandatory minimum sentence under the drug quantity found by the judge.  Lizardo makes a number of arguments concerning the sentence he received.[9]

Lizardo first claims that his right to confront witnesses, under Crawford v. Washington, 541 U.S. 36 (2004), was violated at his sentencing because "all of the information about drug quantity was testimonial and not presented to a jury."  While he recognizes that our prior decisions clearly state that Crawford does not apply to sentencing, see United States v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005), he nevertheless urges us to reconsider this position.  We are, however, bound by this precedent, which only an en banc court can change.  See United States v. Baskin, 424 F.3d 1, 4 n.2 (1st Cir. 2005).

Lizardo next contests the judge's factual finding that 1.5 kilograms of cocaine were attributable to him.  "[W]hen a

---

[8]  The sentencing hearing took place in May 2004, which was before the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005).

[9]  We summarily dismiss one of these arguments.  Lizardo argues that we should remand under Booker for the district court to reconsider the magnitude of the downward departure under the now advisory Sentencing Guidelines.  Because Lizardo received the statutory mandatory minimum sentence, there was no error under Booker.  See United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005).

district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004). At trial, Yturrino testified that Lizardo was present when Bello gave him 1.5 kilograms of cocaine, and this was the basis for the district court's finding that this amount was attributable to Lizardo. This finding is clearly individualized to Lizardo, and we find no error in the district court's factual finding.

Lizardo also argues that since the jury did not determine the drug quantity attributable to him, the sentencing judge violated Apprendi v. New Jersey, 530 U.S. 466 (2000), by finding that 1.5 kilograms were attributable to him.[10] Apprendi holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. For the crime for which the jury convicted Lizardo, the statutory maximum for the minimum possible drug quantity is 20 years. 21 U.S.C. § 841(b)(1)(C). Since the judge sentenced Lizardo to only five years of imprisonment, there was no

---

[10] Lizardo made no objection below, so we review only for plain error. United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Nevertheless, we find no error, never mind plain error.

-30-

*Apprendi* violation. See United States v. Pérez-Ruiz, 353 F.3d 1, 15 (1st Cir. 2005).

Lizardo's final sentencing argument requires a more detailed analysis. Because the jury convicted Lizardo but was not asked to find a specific drug quantity, we attribute a minimal drug quantity to the jury's verdict. See Pérez-Ruiz, 353 F.3d at 17. For a minimal drug quantity, the statutory sentencing range would be zero to twenty years. 21 U.S.C. § 841(b)(1)(C). In contrast, under the drug quantity of 1.5 kilograms found by the district court, the statutory sentencing range would be five to forty years. Id. § 841(b)(1)(B). The sentence imposed by the judge, five years, was within both of these ranges, but greater than the Guideline range of 46 to 57 months. The district court imposed the five year sentence because it found that the statutory mandatory minimum sentence was five years. Lizardo argues that the district court committed plain error in determining the statutory mandatory minimum sentence on the basis of a drug quantity found by the judge rather than by the jury.

We addressed precisely this issue in United States v. Goodine, where we upheld the district court's application of a mandatory minimum sentence under § 841(b)(1) based on judicially found facts. 326 F.3d 26, 33 (1st Cir. 2003). We decided Goodine after Apprendi but before Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005). Lizardo

argues that the Supreme Court's intervening opinion in <u>Booker</u> overrules this aspect of our decision in <u>Goodine</u>.

Lizardo's argument is based on the following language from <u>Goodine</u>: "Nothing in <u>Apprendi</u> or subsequent cases calls into question the validity of the Sentencing Guidelines . . . ." <u>Goodine</u>, 326 F.3d at 33. According to Lizardo, because <u>Booker</u> made the Guidelines advisory, it thus follows that <u>Goodine</u> must be overruled. We disagree. <u>Booker</u>, like <u>Apprendi</u>, was concerned only with "sentence[s] <u>exceeding the maximum</u> authorized by the facts established by a plea of guilty or a jury verdict." <u>Booker</u>, 543 U.S. at 244 (emphasis added). <u>Booker</u> left intact the Supreme Court's precedent in <u>Harris</u> v. <u>United States</u>, 536 U.S. 545, 568 (2002), which allowed the use of judicially found facts to increase a mandatory minimum sentence, and thus also leaves <u>Goodine</u> intact.[11]

## VIII.  Conclusion

For the foregoing reasons, we affirm Lizardo's conviction and sentence.

**Affirmed**.

---

[11]  Other circuits are split as to whether judicially found facts can be used to increase the statutory mandatory minimum sentence under § 841(b)(1). <u>See</u> <u>United States</u> v. <u>González</u>, 420 F.3d 111, 130 (2005).