NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2018-0355

THE STATE OF NEW HAMPSHIRE

v.

PAULSON PAPILLON

Argued: September 12, 2019
Opinion Issued: February 13, 2020

Gordon J. MacDonald, attorney general (Peter Hinckley, senior assistant attorney general, on the brief and orally), for the State.

Law Offices of Kelly E. Dowd, PLLC, of Keene (Kelly E. Dowd on the brief and orally), for the defendant.

HANTZ MARCONI, J.  Following a jury trial in Superior Court (Brown, J.), the defendant, Paulson Papillon, was convicted of conspiracy to commit murder, see RSA 629:3 (2016); RSA 630:1-a, I(a) (2016), and as an accomplice to reckless second-degree murder, see RSA 626:8 (2016); RSA 630:1-b, I(b) (2016).  On appeal, he argues that the trial court erred by: (1) concluding that he knowingly, intelligently, and voluntarily waived his right to counsel; (2) admitting evidence, in violation of New Hampshire Rule of Evidence 404(b), that he offered to facilitate the murder of another suspected police informant; and (3) finding the evidence sufficient to support his convictions.  We affirm.

The jury could have found the following facts. During the latter half of 2015, the defendant and his associates, Adrien Stillwell, Nathaniel Smith, and Michael Younge, sold drugs in and around Manchester. The four men shared access to at least two apartment buildings, called "trap houses," from which they furthered their operation. The victim, M.P., regularly purchased drugs from the defendant, Stillwell, Smith, and Younge. On October 21, 2015, a confidential informant and M.P. each purchased drugs from the defendant at a Manchester hotel. That same day, the defendant was arrested and jailed after the hotel was searched, and the defendant came to believe that M.P. was the "snitch" responsible for his arrest.

The defendant was released on bail on October 26, and over the next several days, he urged Stillwell, Smith, and Younge to kill M.P. for his suspected role in the defendant's arrest. The day after the defendant was released, he paid to bail Smith out of jail so that Smith could help Stillwell and Younge murder M.P. The defendant continued to raise the topic of killing M.P. with his associates, offering them money and drugs to do so and emphasizing that it needed to happen "before he had court."

On October 31, Halloween, the defendant, Stillwell, Smith, and Younge met at one of the trap houses. The defendant once again pressed the three men to kill M.P., saying it should happen that night. To facilitate this plan, the defendant provided a gun — a .357 — and Halloween costumes, which he intended Stillwell, Smith, and Younge to wear as disguises. Deciding against the costumes, Stillwell, Smith, and Younge left to find and kill M.P. Stillwell and Smith were both armed — Stillwell with the .357 that the defendant had provided. Meanwhile, the defendant went to a casino in Connecticut so that its security cameras could prove he was in another state when M.P. died. However, Stillwell, Smith, and Younge decided "it wasn't a good opportunity" to kill M.P. after they saw him in his residence that night.

The defendant was upset when he discovered that M.P. was still alive after Halloween. He reiterated that he "needed it done" before he had to appear in court and said if Stillwell, Smith, and Younge "couldn't do it," he would have someone else kill M.P. On both November 2 and 3, cell phone contact among the four men rose to an unusual level. At approximately 6:00 p.m. on November 3, Stillwell called and sent a text message to the defendant. Shortly after 6:00 p.m., Stillwell — armed again with the .357 — and Smith met Younge at a convenience store near M.P.'s apartment building where they were captured on the store's security cameras. At approximately 6:17 p.m., they started walking up the street towards M.P.'s residence to make another attempt on his life. This time, Stillwell, Smith, and Younge found M.P. outside his apartment building. When M.P. began to walk away, Stillwell ran after him, firing the .357 six times. M.P. was shot twice and died at approximately 6:20 p.m. The defendant "made sure he wasn't there" when M.P. was killed, having had an acquaintance drive him to Massachusetts earlier that day.

2

After fleeing the scene, Stillwell and Younge returned to the apartment where they had met the defendant on Halloween and asked the woman who lived there, A.D., if the defendant "was back yet." Within minutes of the shooting, cell phone records showed that Stillwell had called the defendant twice and had exchanged text messages with the defendant. The defendant told A.D. to try calling M.P., feigning the need to set up a delivery for some drugs that she owed M.P. At approximately 8:00 p.m., the defendant, who by that time had returned to the trap house, sent Smith a text message that there was a large quantity of drugs waiting for him there. Smith arrived shortly thereafter.

The defendant met with Stillwell, Smith, and Younge in A.D.'s bathroom in an attempt to avoid being overheard, and his associates recounted how M.P. was killed. The defendant was happy to hear that M.P. was dead, started handing out drugs and money to his three associates, and said that they could "get back to business" now that the suspected informant was dead. However, the defendant became upset when Younge told him that the convenience store's security camera would have them on video before the murder, and the four of them discussed going to Connecticut the next day "to get out of town."

On November 4, the defendant, Stillwell, and Younge drove to Connecticut in a rented car. Along the way, Younge discarded the clothes he had worn the day before, and Stillwell and Younge discarded their cell phones. The defendant paid for Stillwell's and Younge's expenses at a casino and strip club in Connecticut. After a few days, the defendant returned to New Hampshire once he believed the investigation into M.P.'s death had cooled off. While another associate was driving the defendant around Manchester, the defendant said, "There's where I killed my f**king rat."

On November 9, the defendant was arrested on charges unrelated to M.P.'s murder. While incarcerated, he shared unpublicized details about M.P.'s death with L.M., a fellow inmate. The defendant told L.M. that he "knew it was done" when he received a phone call after M.P.'s death, and that he "had to have it done" because M.P. was going to inform on him "for some drugs." The defendant also communicated frequently with his sister via recorded phone calls from the prison to discuss the ongoing murder investigation. Stillwell and Smith had also been incarcerated in November on charges unrelated to M.P.'s murder, and Younge turned himself in on November 19 after his photograph was released in connection with M.P.'s death. The defendant was frustrated and nervous because he thought Stillwell, Smith, and/or Younge would implicate him in M.P.'s murder. The defendant told his sister that he wanted to send money to Stillwell and had her deliver drugs to Younge before Younge was arrested, but ultimately, the defendant wanted to bail himself and his associates out of jail in order to kill them before they could tell the police about his involvement in M.P.'s death.

3

Following a jury trial, the defendant was convicted of conspiracy to commit murder and as an accomplice to reckless second-degree murder. This appeal followed.

## I.  Waiver of Right to Counsel

The defendant argues that the trial court erred by permitting him to represent himself because there was insufficient evidence that he knowingly, intelligently, and voluntarily waived his right to counsel.

Both Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to counsel and the right to self-representation. State v. Martin, 171 N.H. 590, 593 (2018). We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

The right to counsel and the right to self-representation are mutually exclusive; the exercise of one right nullifies the other. Martin, 171 N.H. at 593; State v. Ayer, 150 N.H. 14, 25-26 (2003) (describing the right to counsel and the right to self-representation as "antithetical"); State v. Barham, 126 N.H. 631, 636 (1985) ("This right to self-representation does not coexist with that of a defendant to be represented by counsel. Rather, its exercise extinguishes the constitutional right to counsel."). Because an accused who represents himself relinquishes "many of the traditional benefits associated with the right to counsel," he "must 'knowingly and intelligently' forgo those relinquished benefits." Faretta v. California, 422 U.S. 806, 835 (1975). The burden is on the State to prove an intentional relinquishment or abandonment of the right to counsel, which depends upon the particular facts and circumstances of the case, including the defendant's background, experience, and conduct. State v. Scarborough, 124 N.H. 363, 369 (1983).

To be effective, an assertion of the right to self-representation must be: (1) timely; (2) clear and unequivocal; and (3) knowing, intelligent, and voluntary. State v. Towle, 162 N.H. 799, 803 (2011). Thus, once a defendant has clearly and unequivocally expressed his desire to represent himself in a timely fashion, the court must ascertain whether the choice has been knowingly and intelligently made. See id. at 803-04; State v. Thomas, 150 N.H. 327, 328 (2003). "The court must, in this analysis, 'indulge in every reasonable presumption against waiver' of counsel." State v. Davis, 139 N.H. 185, 190 (1994) (quoting Barham, 126 N.H. at 637). "The court must also make the defendant 'aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" Barham, 126 N.H. at 637 (quoting Faretta, 422 U.S. at 835). "[I]f a defendant is 'literate, competent, and understanding, and . . . voluntarily exercising his informed free will,' then a waiver may be found to be

4

knowing and intelligent." Thomas, 150 N.H. at 328 (quoting Faretta, 422 U.S. at 835).

The defendant contends that because the trial court failed to conduct a sufficient colloquy, the court could not determine that his waiver was knowing, intelligent, and voluntary. By contrast, the State argues that the trial court properly found, after inquiring of the defendant and "unambiguously caution[ing] him on the pitfalls of self-representation," that the defendant's decision was knowing, intelligent, and voluntary. Based upon our review of the record, we agree with the State.

After two days of trial, defense counsel informed the trial court that the defendant wished to represent himself. The trial court conducted a colloquy with the defendant, first inquiring into the reasons why he no longer wished to be represented by his trial counsel. The defendant, who had already drafted motions on his own behalf, articulated his perceived shortcomings of counsel, explaining that he disagreed with their trial strategy and had been "bumping heads [with them] for a while." The trial court noted that it had recognized this tension, but stressed that the defendant would be at a disadvantage in proceeding without his attorneys, particularly in light of their criminal defense experience, the "severity of [his] charges," and the "significant legal issues" that had yet to be addressed at trial. The trial court informed the defendant that he would be responsible for dealing with such legal issues, cross-examining witnesses, "presenting [his] case" after the State had rested, making and responding to objections, and delivering closing arguments. The trial court also confirmed that the defendant was not then under the influence of drugs or alcohol.

With the defendant's approval, the trial court appointed his defense attorneys as standby counsel. The court thoroughly explained standby counsel's role, emphasizing that the defendant may seek their assistance on questions of law or courtroom procedure, but that standby counsel were under no obligation to affirmatively offer advice or direction going forward. Throughout the trial court's explanations, the defendant continued to unquestionably reassert his desire to represent himself and express his understanding of the information and cautionary warnings he received.

The defendant nonetheless argues that the record does not establish he knowingly, intelligently, and voluntarily waived his right to counsel because the trial court failed to inquire into his "ability to represent himself," specifically that the trial court "made no inquiry into [his] education, training, legal experience, or even mental health." To the extent the defendant is arguing that he was incompetent and therefore could not have waived his right to counsel, we find that such an argument is, under the circumstances of this case, without merit and warranting no further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

5

We are not persuaded by the defendant's remaining critiques of the trial court's colloquy. We strongly prefer that trial court judges engage in a colloquy with a defendant who wishes to waive his or her right to counsel, but we have not required that any precise language or inquiries be employed so long as, by the totality of circumstances, the record reflects that the defendant was aware of the dangers and disadvantages of self-representation and made a knowing, intelligent, and voluntary waiver of his right to counsel. See Thomas, 150 N.H. at 329-30 (identifying Davis as "setting forth model colloquy for waiver of right to counsel").

Furthermore, contrary to the defendant's assertion, "'a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation.'" Hart v. Warden, N.H. State Prison, 171 N.H. 709, 727 (2019) (quoting Godinez v. Moran, 509 U.S. 389, 399 (1993)); see Faretta, 422 U.S. at 836 ("We need make no assessment of how well or poorly [the defendant] had mastered the intricacies [of the law] . . . [f]or his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself."). While "'[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,'" Hart, 171 N.H. at 727 (quoting Faretta, 422 U.S. at 834), "a defendant has a constitutional right to represent himself, whether or not that representation will be to his detriment." Barham, 126 N.H. at 639.

On the particular facts and circumstances of this case, we conclude the State has met its burden to show that the defendant knowingly, intelligently, and voluntarily waived his right to counsel. See Thomas, 150 N.H. 329-30; Scarborough, 124 N.H. at 369. The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. See Faretta, 422 U.S. at 834-35; Thomas, 150 N.H. at 328, 330. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## II. Rule 404(b) Evidence

The defendant next argues that the trial court erred in admitting witness testimony that he had offered to kill another suspected police informant because it was irrelevant and unduly prejudicial in violation of New Hampshire Rule of Evidence 404(b). The State argues that Rule 404(b) does not apply to the challenged testimony because it was properly admitted as evidence intrinsic to the charged offenses, and alternatively, that any error in admitting this testimony was harmless. We hold that the testimony at issue was admitted in error, but that this error was harmless beyond a reasonable doubt.

The challenged testimony occurred on the third day of trial, after the defendant's motion to represent himself had been granted. During the State's direct examination of J.M., an acquaintance of the defendant who lived in one

6

of the trap houses, the prosecutor began eliciting testimony about a conversation the defendant had with her regarding her ex-fiancé. The defendant objected on Rule 404(b) grounds, asserting that the State was about to elicit testimony that he had "offered to commit another informant murder." In response, the State proffered that J.M. would testify that the defendant "told her words to the effect of give me some money and I'll kill the snitch like I'm going to be doing in my case." The State argued that the anticipated testimony — that the defendant had offered to kill an additional, unrelated informant — was not "extrinsic of the crime." In apparent reliance on the State's argument, the trial court overruled the defendant's objection.

The following exchange then occurred:

[PROSECUTOR:] Now if you can tell the jurors the conversation that you have [with] the Defendant before [M.P.'s] shooting death.

[J.M.:] I was standing outside — well, standing at my doorway, and I was waiting for my daughter to come home. And [the defendant] came up to me. And my ex-fiancé had just gotten in big trouble for selling drugs. And he told me you can do just what I'm going to do. All I need is $1000 and my boy will take care of it. And no snitch, no case or no body, no case, or something like that. So he said wait. He was telling me to come up with $1000 and I could get rid of the guy that set my ex-fiancé up.

[PROSECUTOR:] And this is a conversation that . . . the Defendant . . . had with you?

[J.M.:] Correct.

[PROSECUTOR:] That you can have your boyfriend's snitch killed just like he's having his snitch killed?

[J.M.:] Yes.

[PROSECUTOR:] No snitch, no case?
. . . .

[J.M.:] Yes.

(Emphases added.) The defendant challenges the admission of the emphasized sentences.

On the fifth day of trial, at the close of evidence and before closing arguments, the defendant moved for a mistrial, arguing, in essence, that J.M.'s testimony constituted inadmissible Rule 404(b) evidence because the State used the evidence for impermissible character purposes and failed to state a

precise chain of reasoning to justify admitting it over his objection. In response, the prosecutor said:

> [The defendant] did come up to the bench and raise a 404(b) objection, and our response to that was that it was an admission by [the defendant]. It's res gestae. It's intrinsic to the offenses for which he's charged. And even if it were to be considered 404(b), it's clearly relevant to motive and intent. But, again, it's an admission that he would offer to kill her snitch just like he was going to kill his snitch. So it's an admission.

No further arguments were offered by either party, and the trial court denied the defendant's motion for a mistrial. The next day, the jury convicted the defendant of conspiracy to commit murder and as an accomplice to reckless second-degree murder.

## A. Admissibility of Challenged Evidence

We first address whether the trial court erred in ruling that Rule 404(b) is not applicable to the challenged testimony that the defendant offered to orchestrate the murder of another suspected informant. "'The proper test to apply in deciding the admissibility of "similar acts" or "other acts" evidence depends upon whether the evidence in question is "intrinsic" or "extrinsic" evidence.'" State v. Dion, 164 N.H. 544, 551 (2013) (quoting United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990)) (noting that the applicable test for admissibility of intrinsic evidence is found in Rule 403). We review the trial court's ruling on the admissibility of evidence for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case. State v. Nightingale, 160 N.H. 569, 573 (2010).

At the time of the defendant's trial, New Hampshire Rule of Evidence 404(b) provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b) (amended 2018); see State v. Plantamuro, 171 N.H. 253, 255 (2018). The rule, "'by its very terms, excludes only extrinsic evidence — evidence of other crimes, wrongs, or acts — whose probative value exclusively depends upon a forbidden inference of criminal propensity.'" State v. Wells, 166 N.H. 73, 77 (2014) (quoting United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005)).

8

"Other act" evidence is "intrinsic," and therefore not subject to Rule 404(b), when the evidence of the other act and the evidence of the crime charged are "inextricably intertwined" or both acts are part of a "single criminal episode" or the other acts were "necessary preliminaries" to the crime charged. Id. "Intrinsic" or "inextricably intertwined" evidence will have a causal, temporal, or spatial connection with the charged crime. Id. (citing United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000) (discussing "background evidence")). "'Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.'" Id. at 77-78 (quoting Hardy, 228 F.3d at 748); see United States v. Clay, 667 F.3d 689, 698 (6th Cir. 2012) (referring to this list — as quoted in Wells — as "[e]xamples of general categories that may satisfy the[] requirements" of intrinsic evidence). "This type of evidence is admissible under the rationale that 'events do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of [the charged] act so that it may realistically evaluate the evidence.'" Wells, 166 N.H. at 78 (quoting Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (en banc) (explaining "same transaction contextual evidence")).

The defendant argues that J.M.'s testimony about his offer to have another suspected police informant killed "was entirely unrelated to the killing of [M.P.]" and that the admission of this evidence of other acts violated Rule 404(b). The State argues that the challenged testimony, as emphasized above, was admissible as intrinsic evidence because it was inextricably intertwined with the defendant's admission to J.M. about what he was "going to be doing" in his case, and the challenged statements "provided necessary context" for his admission to J.M. about conspiring with and soliciting his associates to kill M.P.

Here, any connection between the challenged statements and the charged offenses is too attenuated for that evidence of other acts to constitute evidence intrinsic to the charged offenses. Evidence that, for $1000, the defendant agreed to have his "boy[s] . . . take care of" another suspected police informant in a separate matter is not necessary to complete the story of the conspiracy to murder M.P. or the defendant's liability as an accomplice to M.P.'s murder. Although these statements were made to J.M. in early November 2015, which bears an arguable "temporal connection" to the charged conspiracy and murder of M.P., without a sufficient underlying factual nexus, these statements are merely coincidental to the charged offenses. See Wells, 166 N.H. at 78 (evidence of uncharged act had a "close temporal connection" to the charged crime where the act "took place immediately prior to the charged act, provided the jury with a full account of a single [criminal episode], and enabled the jury to realistically evaluate [the victim's] testimony"); Dion, 164 N.H. at 546-47, 550-51 (concluding that evidence of defendant's cell phone use

9

during a thirty-seven minute car ride prior to a fatal collision with a pedestrian was intrinsic to the charged offense of negligent homicide).

Importantly, the defendant's apparent willingness to facilitate the murder of another, unrelated, suspected "snitch" was not "part of the same criminal episode" or at all part of a sequence of events leading to the charged conspiracy to murder M.P. or his subsequent murder. See Wells, 166 N.H. at 77 (concluding Rule 404(b) did not apply "because the . . . testimony was admissible evidence of a single criminal episode"); Nightingale, 160 N.H. at 574 (emphasizing that "[t]he conversations at issue and the crime charged in the indictment [were] part of a single criminal episode" in concluding Rule 404(b) did not apply (quotation omitted)); State v. Martin, 138 N.H. 508, 517-18 (1994) (explaining that Rule 404(b) did not apply to threats defendant made to victim because the threats "were a material part of the entire course of conduct surrounding the commission of the alleged [aggravated felonious sexual assaults]").

Although evidence that "forms an integral part of a witness's testimony" about the charged offense(s) may also suggest that said evidence is intrinsic, Wells, 166 N.H. at 77-78 (quotation omitted), here the challenged statements fall short of forming an integral part of J.M.'s testimony that the defendant admitted he was going to kill the "snitch" in his case. See id. at 77; Clay, 667 F.3d at 698. Absent the challenged statements, J.M.'s testimony details the defendant's advice to her on how to handle her ex-fiancé's "snitch" problem — by "do[ing] just what [he's] going to do. . . . [N]o snitch, no case, or no body, no case." We are not persuaded that removing the challenged statements renders J.M.'s testimony unintelligible or creates a vacuum in the story of the charged crimes. See Wells, 166 N.H. at 78; Clay, 667 F.3d at 698 (explaining that evidence was not intrinsic where "it [was] a completely separate and distinct offense that is not essential for providing a coherent and intelligible description of the charged offense" (quotation omitted)); 1 George Dix et al., McCormick on Evidence § 190, at 754 (6th ed. 2006)). Contrary to the State's position, it is not enough that the challenged statements about the defendant's offer to kill another suspected police informant added "probative force" to J.M.'s testimony; the statements were not necessary or essential to enable the jury to "realistically evaluate her testimony" about the charged offenses — that the defendant was admitting he was going to kill the "snitch" in his own case. Wells, 166 N.H. at 77-78; see Clay, 667 F.3d at 698; 29A Am. Jur. 2d Evidence § 876, at 175 (2008) ("Other criminal act evidence admissible as part of the res gestae or same transaction introduced for the purpose of explaining the crime charged must be confined to that which is reasonably necessary to accomplish such purpose." (emphasis added)). The challenged statements do not have a sufficient connection to the remainder of the defendant's admissions to J.M. such that they formed an "integral" part of her testimony. See Hardy, 228 F.3d at 748 ("[T]he 'background circumstances exception' to the general exclusion of other act evidence is not an open ended basis to admit any and all other act

evidence the proponent wishes to introduce.  Rather the very definition of what constitutes background evidence contains inherent limitations."); Clay, 667 F.3d at 698 (noting that the intrinsic evidence exception to Rule 404(b) "contains severe limitations").

The State's argument that, without the challenged testimony, it would be unclear why the defendant "made an admission to murder out of the blue and with no reason, to a person with whom he rarely interacted and to whom he seldom spoke," is also insufficient to allow J.M.'s testimony about the defendant's offer to arrange the killing of another, unrelated, suspected informant to permissibly escape the requirements of Rule 404(b).  See State v. Melcher, 140 N.H. 823, 829-30 (1996) (applying Rule 404(b) to testimony about the relationship between defendant and victim and rejecting the trial court's finding that such testimony was admissible under Rule 404(b) because "the relationship ultimately made it 'unlikely that the act would occur out of the blue'"); United States v. Gibbs, 797 F.3d 416, 424 (6th Cir. 2015) (rejecting the government's argument that evidence of other acts was intrinsic because, without the evidence, "it might be unclear why [witnesses] came forward").

To the extent the State argues that Rule 404(b) does not apply to the challenged testimony because it constitutes a statement of a party opponent, we disagree.  The mere fact that a witness's testimony constitutes statements by a party opponent, i.e., "admissions," does not implicate the intrinsic evidence doctrine.  See State v. Pepin, 156 N.H. 269, 275-79 (2007) (analyzing a verbal threat under Rule 404(b)); State v. Richardson, 138 N.H. 162, 164-68 (1993) (analyzing defendant's collective statements and behavior shortly before and after the charged offense under Rule 404(b)); People v. Ventimiglia, 420 N.E.2d 59, 63 (N.Y. 1981) (clarifying that the admissibility of "inextricably interwoven" evidence "does not make evidence admissible simply because it is a part of [a] conversation other parts of which are admissible").  An out of court statement is not admissible merely because it is not hearsay under Rule 801(d)(2)(A) — it must also pass muster under the other rules of evidence. State v. Belonga, 163 N.H. 343, 359 (2012); see United States v. Oberle, 136 F.3d 1414, 1418 (10th Cir. 1998) ("Although the statements are party admissions . . . and thus not hearsay, they must nevertheless also be analyzed for admissibility under Rule 404(b) because they reveal or suggest prior criminal conduct.").

In analyzing the applicability of the intrinsic evidence exception to Rule 404(b), we must remain mindful of the purpose of Rule 404(b), which is to "ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs."  State v. Beltran, 153 N.H. 643, 647 (2006).  The intrinsic evidence exception "cannot serve as a backdoor to circumvent" this purpose.  Gibbs, 797 F.3d at 423 (quotation omitted); see also State v. Crosby, 142 N.H. 134, 138 (1997) ("The State may not employ a trial strategy of introducing evidence which itself

creates the necessity for admitting bad acts evidence."). Here, in deciding whether to convict the defendant for conspiring to murder M.P. and for his role as an accomplice to M.P.'s murder, the jury was permitted to consider evidence that the defendant offered to orchestrate the killing of another, unrelated, suspected police informant. Because this evidence of other acts was not intrinsic to the charged offenses, the proper rule governing the statements' admissibility is Rule 404(b). See Dion, 164 N.H. at 551. Therefore, the trial court unsustainably exercised its discretion in concluding that Rule 404(b) did not apply.[1]

## B. Harmless Error

Having concluded that the challenged evidence was subject to Rule 404(b), we need not decide whether its admission under that rule was error because we agree with the State that any error in admitting the challenged testimony was harmless beyond a reasonable doubt.

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

State v. Edic, 169 N.H. 580, 588 (2017) (quotation omitted). To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdicts. Id. This standard applies to both the erroneous admission and exclusion of evidence. Id. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the improperly admitted evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. at 588-89. In making this determination, we consider the alternative evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 589.

To convict the defendant of conspiracy to commit murder as charged in the indictment, the State was required to prove that, with a purpose that the crime of murder be committed, the defendant agreed with Younge, Stillwell, and/or Smith to cause the death of M.P., and that one or more of the co-conspirators committed an overt act in furtherance of the conspiracy. See RSA 629:3, I; RSA 630:1-a, I(a). To convict the defendant as an accomplice to reckless second-degree murder as charged in the indictment, the State was

---

[1] This error formed the basis for the defendant's motion for a mistrial, which the trial court denied. Although the defendant claims on appeal that the trial court erred in denying his motion for a mistrial, this argument is inadequately briefed and is therefore waived. See State v. Barr, 172 N.H. __, __ (decided Nov. 22, 2019) (slip op. at 4).

required to prove that the defendant, acting in concert with Younge, Stillwell, and/or Smith, caused the death of M.P. recklessly under circumstances manifesting an extreme indifference to the value of human life. RSA 626:8; RSA 630:1-b, I(b).

There was overwhelming evidence of the defendant's guilt as a co-conspirator and as an accomplice to the murder of M.P. Younge testified in detail regarding the defendant's role in encouraging, planning, and facilitating M.P.'s murder. Other witnesses corroborated his testimony, including the facts that the defendant wanted M.P. killed because he thought M.P. was a police informant, had paid to bail Smith out of jail so that Smith could help kill M.P., and encouraged his associates to wear Halloween costumes as disguises to kill M.P. The jury heard evidence that the defendant was happy upon learning of M.P.'s death and told his associates to "get back to business." A.D. testified that she confirmed M.P.'s death at the defendant's behest, and cell phone records showed the defendant was in contact with his co-conspirators shortly before and after the murder. Testimony showed that the defendant rewarded his associates with drugs, money, and an expenses-paid trip to Connecticut once M.P. was murdered. Notably, there was also substantial evidence of the defendant's own inculpatory statements supporting both charges.

The jury also heard evidence about how the defendant left the State on Halloween and before M.P.'s murder on November 3 so that he would have an alibi and took Younge and Stillwell to Connecticut the day after M.P. was murdered to "get out of town." Recorded phone calls with his sister and testimony from the defendant's fellow inmate, L.M., revealed the defendant's concern over whether he would be implicated in M.P.'s death and his efforts to prevent his associates from talking to the police, up to and including the defendant's desire to kill his co-conspirators. These facts were all evidence of the defendant's consciousness of guilt. See State v. Colbath, 171 N.H. 626, 638 (2019); Edic, 169 N.H. at 590; State v. Etienne, 163 N.H. 57, 85-86 (2011).

Compared to the substantial strength of the evidence of the defendant's guilt on both charges, the challenged testimony was inconsequential. See Edic, 169 N.H. at 591-92. Although the admission of J.M.'s testimony about the defendant's offer to facilitate the murder of another suspected police informant undoubtedly prejudiced him, see State v. Davidson, 163 N.H. 462, 471 (2012), a review of the record belies any concern that the introduction of the challenged testimony denied the defendant a fair verdict. The jury had before it overwhelming evidence of the defendant's guilt in the conspiracy to murder M.P. and as an accomplice to M.P.'s eventual murder. In relation, the erroneously admitted testimony was inconsequential.[2] Accordingly, we conclude that the State has met its burden of proving that the error in

---

[2] This case presents a rare instance of a harmless Rule 404(b) error. State v. Smith, 141 N.H. 271, 279-80 (1996).

13

admitting the challenged testimony did not affect the verdicts, and was, therefore, harmless beyond a reasonable doubt.  See Edic, 169 N.H. at 588-92.

### III. Sufficiency of the Evidence

Lastly, the defendant argues that the evidence was insufficient to support his convictions.  To prevail upon his challenges to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt.  State v. Vincelette, 172 N.H. 350, 354 (2019).  Because challenges to the sufficiency of the evidence raise a claim of legal error, our standard of review is de novo.  State v. Lisasuain, 167 N.H. 719, 722 (2015).

As to the defendant's conspiracy conviction, RSA 629:3, I, provides:

> A person is guilty of conspiracy if, with a purpose that a crime defined by statute be committed, he agrees with one or more persons to commit or cause the commission of such crime, and an overt act is committed by one of the conspirators in furtherance of the conspiracy.

RSA 629:3, I.  Conspiracy punishes the agreement to commit or cause the commission of a crime.  State v. Chaisson, 123 N.H. 17, 24 (1983).  "[A] tacit understanding between the parties to cooperate in an illegal course of conduct will warrant a conviction for conspiracy," so long as one of the co-conspirators commits an overt act in furtherance thereof.  State v. Kilgus, 128 N.H. 577, 586 (1986) (quotation omitted).  Here, the State charged the defendant with conspiring to commit first degree murder.  See RSA 630:1-a, I(a) (defining first degree murder, in part, as "[p]urposely caus[ing] the death of another").

The defendant argues that there was insufficient evidence of an agreement to cause M.P.'s death to support his conviction for conspiracy because "[t]here was no meeting of the minds to kill [M.P.] on November 3, 2015."  This argument misconstrues the State's burden in proving the defendant's guilt.

As an initial matter, the State was not required to prove that an agreement to commit murder occurred on the same day that said murder was in fact committed because "[c]onspiracy is an inchoate crime that does not require the commission of the substantive offense that is the object of the conspiracy . . . ."  State v. Donohue, 150 N.H. 180, 185 (2003).  Furthermore, the defendant's indictment did not allege that the defendant participated in an agreement to murder M.P. on November 3.  The defendant's indictment for conspiracy to commit murder alleged in pertinent part:

14

[O]n or between <u>October 8, 2015, and November 3, 2015</u>, . . . with the purpose that the crime of murder be committed, a crime defined by RSA 630, Paulson Papillon agreed with Michael Younge, Adrien Stillwell, [and/or] Nathaniel Smith . . . to cause the death of [M.P.], and that one or more of the co-conspirators committed one or more of the following overt acts in furtherance of the conspiracy: [alleging nineteen distinct overt acts.]

(Emphasis added.) Thus, even assuming that no rational jury could have found that a "meeting of the minds" occurred on November 3, the defendant's argument is unavailing.

The defendant also attempts to import the contractual principles of "offer" and "reject[ion]" into the agreement element of the conspiracy statute, arguing that the evidence as to that element was insufficient because Stillwell, Smith, and Younge "expressly rejected the means and mode that [the defendant] proposed to carry out his intended plot" — namely, killing M.P. on Halloween while wearing costumes that the defendant had provided. This argument presumes that the jury was compelled to adopt the defendant's characterization of Stillwell, Smith, and Younge's behavior. It was not. See State v. Woodbury, 172 N.H. 358, 364 (2019) ("[M]atters such as weighing evidence, determining witness credibility, and resolving conflicts in witness testimony are left to the jury."); State v. Demond-Surace, 162 N.H. 17, 29 (2011) ("[T]he jury was free to weigh and draw inferences from all of th[e] evidence . . . .").

There was sufficient evidence from which a jury could have found that the defendant had, at a minimum, a "tacit understanding" with Stillwell, Smith, and Younge to cause M.P.'s death as alleged in the indictment. Kilgus, 128 N.H. at 586 (quotation omitted). At trial, the State presented evidence that, after the defendant was released on bail on October 26, the defendant had several conversations with Stillwell, Smith, and Younge regarding his desire to have M.P. killed and his willingness to work toward that end. The State presented evidence that the defendant urged Stillwell, Smith, and Younge to kill M.P., promised them money and drugs, and pushed them to kill M.P. on Halloween. After the aborted Halloween attempt, the defendant reiterated his need to have M.P. killed, and cell phone records showed that the defendant was in contact with his associates shortly before and after M.P. was shot on November 3. There was evidence that Stillwell and Younge took steps to report M.P.'s death to the defendant, that the defendant rewarded his associates with drugs and money the night of the murder, and that he had A.D. confirm that M.P. was dead. The State presented evidence that the defendant took steps to establish alibis for himself and attempted to cover up his involvement in the murder by taking Stillwell and Younge to Connecticut, coordinating with his sister while he was in prison to deliver drugs to Younge and money to Stillwell, and even planning to kill his co-conspirators to keep them quiet. The jury also

15

heard witness testimony that, after M.P.'s killing, the defendant told an associate, "There's where I killed my f\*\*king rat," and told L.M. in prison that he, the defendant, "had to have it done" because M.P. was going to inform on him "for some drugs." Viewing this evidence in the light most favorable to the State, we hold that a rational trier of fact could have found beyond a reasonable doubt that there was an agreement between the defendant and Younge, Stillwell, and/or Smith to purposely cause the death of M.P.[3] We accordingly uphold the defendant's conviction for conspiracy to commit murder.

We next consider whether there was sufficient evidence to convict the defendant as an accomplice to reckless second-degree murder. See RSA 626:8; RSA 630:1-b, I(b). His indictment for second degree murder alleged that: "Paulson Papillon, acting in concert with Michael Younge, Adrien Stillwell and/or Nathaniel Smith, caused the death of [M.P.] recklessly under circumstances manifesting an extreme indifference to the value of human life, in that Younge, Stillwell and/or Smith shot [M.P.] in the torso." The defendant makes several arguments that the evidence was insufficient to support his conviction as an accomplice to reckless second-degree murder, including multiple legal arguments regarding the interpretation of the accomplice liability statute. We are not persuaded by the defendant's arguments and conclude there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was guilty as an accomplice to the murder of M.P.

The defendant first suggests that his conviction as an accomplice to reckless second-degree murder is inconsistent with his conspiracy conviction because the evidence cannot demonstrate a reckless intent and a purposeful intent simultaneously, and "[o]ne cannot solicit, conspire or plan . . . a reckless homicide." See RSA 626:8; RSA 630:1-b, I(b). The State avers that the verdicts are not inconsistent, and alternatively, any such inconsistency does not entitle the defendant to relief. Inconsistency, in the context of this argument, means "[a]n alleged or actual lack of rational compatibility between the verdicts." State v. Chapin, 128 N.H. 355, 357 (1986). There is no reversible inconsistency between verdicts if, upon consideration of the facts and circumstances of the case, the jury's conclusions can be reconciled on a rational basis. Id. We agree with the State that no reversible inconsistency exists.

The fact that the jury concluded that M.P.'s death was ultimately caused "recklessly under circumstances manifesting an extreme indifference to the value of human life," RSA 630:1-b, I(b), is not inconsistent with the defendant's

---

[3] The defendant's challenge to the sufficiency of the evidence on his conspiracy conviction is limited to the "agreement" element. He does not argue that there was insufficient evidence of an overt act committed by one of the conspirators in furtherance of the conspiracy. We therefore do not consider whether the evidence was sufficient as to the unchallenged element.

conspiracy conviction because "conspiring to commit a crime and actually committing it are two separate offenses." State v. Sanchez, 152 N.H. 625, 630 (2005); see Chaisson, 123 N.H. at 24 (explaining that conspiracy to receive stolen property is a separate and distinct crime from the crime of receiving stolen property); see also Donohue, 150 N.H. at 185. The jury was free to consider all of the evidence separately in each indictment. State v. King, 151 N.H. 59, 64 (2004).

Contrary to the defendant's argument, our decision in Donohue does not render his conviction for conspiracy to commit murder inconsistent with his conviction as an accomplice to reckless second-degree murder. In Donohue, we concluded that the defendant's indictment, which charged him with "conspiracy to commit second-degree assault," was flawed, and we reversed his conspiracy conviction for the reason that "a person cannot agree, in advance, to commit a reckless assault, because, by definition, a reckless assault only arises once a future harm results from reckless behavior." Donohue, 150 N.H. at 182, 186 (emphasis added). Here, however, the defendant's indictment for conspiracy charged that, "with the purpose that the crime of murder be committed," as defined by the first degree murder statute, RSA 630:1-a, I(a), he agreed with Stillwell, Smith, and/or Younge to cause M.P.'s death. (Emphasis added.) Therefore, no reversible inconsistency exists.

The defendant also raises multiple legal arguments interpreting the accomplice liability statute itself, which we understand to underlie his argument that the evidence was insufficient to convict him as an accomplice to reckless second-degree murder. The plain language of RSA 626:8 and our case law on accomplice liability do not support the defendant's interpretation.

Statutory interpretation is a question of law, which we review de novo. State v. Rivera, 162 N.H. 182, 185 (2011). In matters of statutory interpretation, this court is the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. Id. We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. RSA 625:3 (2016). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Rivera, 162 N.H. at 185. Further, we interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. Id. Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. Id.

RSA 626:8 provides in pertinent part:

III. A person is an accomplice of another person in the commission of an offense if:
    (a) With the purpose of promoting or facilitating the commission of the

17

offense, he solicits such other person in committing it, or aids or agrees or attempts to aid such other person in planning or committing it; . . .

. . . .

IV. Notwithstanding the requirement of a purpose as set forth in paragraph III(a), when causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense. In other words, to establish accomplice liability under this section, it shall not be necessary that the accomplice act with a purpose to promote or facilitate the offense. An accomplice in conduct can be found criminally liable for causing a prohibited result, provided the result was a reasonably foreseeable consequence of the conduct and the accomplice acted purposely, knowingly, recklessly, or negligently with respect to that result, as required for the commission of the offense.

RSA 626:8. Here, the statute implicated by paragraph IV underlying the defendant's accomplice charge was the second degree murder statute, RSA 630:1-b, I(b) (defining second degree murder as "caus[ing] such death recklessly under circumstances manifesting an extreme indifference to the value of human life").

The defendant argues that "[p]roof of criminal solicitation [under RSA 629:2] requires evidence that the defendant acted purposely, the highest mens rea in the criminal code," and again asserts that evidence of purposeful behavior cannot simultaneously demonstrate a reckless intent. The defendant improperly conflates the crime of criminal solicitation, see RSA 629:2 (2016), with the requirements of paragraph III of the accomplice liability statute.

The State must prove the elements of both paragraph III and paragraph IV of RSA 626:8. State v. Duran, 158 N.H. 146, 151 (2008); see State v. Anthony, 151 N.H. 492, 493-95 (2004). "[Paragraph] III contains dual requirements that the defendant act with the purpose of promoting the commission of the offense and that he actually solicit or aid or attempt to aid another in its commission." Id. "[T]he standard interpretation of the phrase 'intent to promote or facilitate the commission of the offense' is that it requires proof of the accomplice's intent to promote or facilitate another person's conduct that constitutes the actus reus of the offense." Anthony, 151 N.H. at 494 (quotation and emphasis omitted). Paragraph IV ensures that when causing a prohibited result is an element of the underlying offense, as with reckless second-degree murder, the State does not need to prove a higher mental state with respect to the result of the underlying crime to convict an accomplice under RSA 626:8 than to convict a principal of the same crime. See Rivera, 162 N.H. at 188 (explaining that "when causing a prohibited result is

18

an element of an offense, paragraph IV modifies the formulation stated in paragraph III," such that "it shall <u>not</u> be necessary that the accomplice act with a purpose to promote or facilitate the <u>offense</u>" (quotation omitted)); <u>Anthony</u>, 151 N.H. at 494-95.

In <u>Anthony</u>, we stated that when the legislature amended the language of paragraph IV to its current form, it did not intend to repeal the requirement that the accomplice "'have as his conscious objective the bringing about of conduct that the . . . [underlying criminal statute] has declared to be criminal.'" <u>Anthony</u>, 151 N.H. at 495 (quoting <u>Model Penal Code</u> § 2.06 cmt. 6(b), at 310 (Official Draft and Revised Comments 1985)). Accordingly, the language of paragraph IV does not alter the requirements or applicability of paragraph III with respect to the <u>actus</u> <u>reus</u> constituting the underlying offense. <u>See id</u>. at 494-95. Thus, to establish accomplice liability, the State must prove that: (1) the accomplice had the purpose to make the crime succeed; (2) the accomplice's acts solicited, aided, or attempted to aid another in committing the offense; and (3) under paragraph IV, the accomplice shared the requisite mental state for the offense. <u>See State v. Winward</u>, 161 N.H. 533, 543 (2011).

Consistent with our interpretation of paragraph III in <u>Anthony</u>, the term "solicits" in RSA 626:8, III refers solely to the <u>actus</u> <u>reus</u> of soliciting. RSA 626:8, III; <u>see Petition of State of N.H. (State v. Laporte)</u>, 157 N.H. 229, 231-32 (2008). The plain language of RSA 626:8, III does not incorporate the elements of criminal solicitation in RSA 629:2, which "encompass[ ] both the <u>actus</u> <u>reus</u> of 'soliciting' and the <u>mens</u> <u>rea</u> of having the 'purpose that another engage in conduct constituting a crime.'" <u>Laporte</u>, 157 N.H. at 232 (quoting RSA 629:2, I) (explaining that "the terms 'criminal solicitation' and 'solicitation' are not synonymous"). Paragraph IV sets forth the <u>mens</u> <u>rea</u> required for the State to prove accomplice liability under RSA 626:8 as, "the culpable mental state specified in the underlying statute with respect to the result." <u>Anthony</u>, 151 N.H. at 495 (quotation omitted); <u>see</u> RSA 626:8, IV; <u>Rivera</u>, 162 N.H. at 187-88; <u>Winward</u>, 161 N.H. at 543. Here, the defendant was charged under paragraph I(b) of the second degree murder statute, which requires the State to prove that he acted "recklessly under circumstances manifesting an extreme indifference to the value of human life." RSA 630:1-b, I(b).

The defendant also argues that there was insufficient evidence to show he was an "accomplice in conduct" under paragraph IV of the accomplice liability statute. He contends that the term "accomplice in conduct" only encompasses behavior that constitutes "direct conduct . . . without a purpose or even knowledge of the probable result," and even when viewed in the light most favorable to the State, his purposeful behavior in the form of "speech acts and performative gestures" only implicates paragraph III of the statute. Based upon this interpretation of RSA 626:8, the defendant argues that the evidence was insufficient to support his conviction because he "was not present at the time of the murder," "had no ability to directly control or influence th[e] event,"

19

and "played no role in the actual commission of the offense." Our case law interpreting RSA 626:8 contradicts these arguments.

The language of paragraph IV does not alter the requirements or applicability of paragraph III, nor does it create a distinction between the paragraphs based on, as the defendant here argues, "[t]he means of acting as an accomplice." See Anthony, 151 N.H. at 494-95 (explaining that the legislature's intent to preserve the requirements of paragraph III "is implicit in paragraph IV's reference to an "'accomplice in conduct'" (quoting RSA 626:8, IV)); see also Rivera, 162 N.H. at 187, 190 (including "planning an armed burglary," "discuss[ing] the possibility that [another accomplice] would shoot [the victim] if there was a stand-off" and the fact that "the men had agreed" an accomplice would hold the victim at gun point when describing evidence supporting defendant's conviction as an accomplice to reckless second-degree murder). Moreover, the State is not required to prove that an alleged accomplice's conduct directly caused the criminal result. See RSA 626:8, IV; Rivera, 162 N.H. at 187. "Paragraph IV plainly states that accomplice liability can flow from conduct 'provided the result was a reasonably foreseeable consequence of the conduct.'" Rivera, 162 N.H. at 187 (quoting RSA 626:8, IV).

Independent of his legal arguments, we also understand the defendant to argue that the evidence presented to the jury was insufficient to support his conviction as an accomplice to reckless second-degree murder. We disagree.

There was ample evidence from which the jury could have found that the defendant was guilty beyond a reasonable doubt as an accomplice to reckless second-degree murder. The State presented evidence that the defendant believed his October 2015 arrest resulted from M.P. informing to the police, that he wanted M.P. killed because of his suspected role as an informant, and had, on multiple occasions, urged Stillwell, Smith, and Younge to kill M.P. In addition, the jury heard evidence that the defendant offered Stillwell, Smith, and Younge incentives to kill the victim, supplied the gun used in the murder, provided costumes in an attempt to aid them in the murder, established alibis for himself, and tried to cover up his involvement in the murder. See, e.g., State v. Laudarowicz, 142 N.H. 1, 5-6 (1997). The State also presented evidence of the defendant's own inculpatory statements, including his statements to L.M. in prison that he, the defendant, "knew it was done" and "had to have it done" because M.P. was going to inform on him "for some drugs." Viewing the evidence in the light most favorable to the State, we conclude a rational jury could have found beyond a reasonable doubt that the State met its burden to convict the defendant as an accomplice to reckless second-degree murder. See RSA 626:8; RSA 630:1-b, I(b).

In conclusion, we hold that: (1) the defendant's waiver of his right to counsel was knowing, intelligent, and voluntary; (2) the challenged statements from J.M.'s testimony were evidence of other acts governed by Rule 404(b) and

admitted in error, but this error was harmless beyond a reasonable doubt; and (3) there was sufficient evidence to support the defendant's convictions for conspiracy to commit murder and as an accomplice to reckless second-degree murder.

<u>Affirmed</u>.

HICKS, BASSETT, and DONOVAN, JJ., concurred.